[No. S036396. June 19, 1995.]

In re FRANK NICOLAS SERRANO on Habeas Corpus.

448

## COUNSEL

Carmela F. Simoncini, Patrick DuNah, under appointments by the Supreme Court, Totaro & Shanahan, Maureen J. Shanahan and Michael R. Totaro for Petitioner.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster and David Delgado-Rucci, Deputy Attorneys General, for Respondent.

## OPINION

**LUCAS, C. J.**—Petitioner is presently incarcerated at Pelican Bay State Prison. He filed a petition for writ of habeas corpus in the Court of Appeal seeking the reinstatement of his appeal, dismissed by the court pursuant to California Rules of Court, rule 17(a), for failure to file an opening brief. In light of the facts of this case, we believe the equities lie in petitioner's favor, and that he is entitled to the reinstatement of his appeal. The judgment of the Court of Appeal denying the petition for writ of habeas corpus is therefore reversed.

## I. BACKGROUND

Petitioner was charged in an amended information with numerous crimes arising out of separate incidents in which he fatally shot one person, attempted to kill another person and a police officer, and assaulted a second police officer and a burglary victim in whose house petitioner hid while attempting to avoid capture by authorities. A Riverside County Superior Court jury found petitioner guilty of all charges filed against him, and found true all sentence enhancing allegations. On August 6, 1991, petitioner was sentenced by the trial court to 25 years to life for first degree murder, and to a consecutive life term with the possibility of parole for willful, deliberate and premeditated attempted murder. A consecutive determinate term of 31 years and 8 months was imposed for the remaining convictions. Petitioner was represented at trial by Sherwin Ellison, private counsel retained by his family. In some court documents, Ellison listed himself as counsel associated with the Law Offices of A. Brent Carruth.

Petitioner's niece, Yvonne Valdepena, states in a declaration that on August 6, 1991, the day of petitioner's sentencing, she was engaged in negotiations with Carruth and Ellison concerning the firm's continued representation of petitioner, and had authorized them to file a notice of appeal on her uncle's behalf. Although the notice was prepared by Carruth's office, it was filed by petitioner in propria persona. This was done, according to Valdepena, because the terms of the retainer agreement between petitioner's family and Ellison and Carruth were not yet finalized.

Valdepena further relates that on September 6, 1991, a retainer agreement was signed under which petitioner's family agreed to make an initial payment to the Carruth firm of $5,000 and, thereafter, seven monthly payments of $1,000 each. It appears that petitioner's family satisfied its obligation in a timely manner.[1] In spite of such payment, however, no one in Carruth's office filed a substitution of attorney form in either the superior court or the Court of Appeal, or, apparently, did any work on the case whatever.[2] As a result, the Court of Appeal at all times regarded petitioner's appeal as having been brought in propria persona, sending all notices and correspondence from the court directly to him in prison.

Although the Court of Appeal mailed petitioner a notice of record completion, it did not mail him a copy of the record on appeal. Rather, in

---

[1] Valdepena's declaration actually gives the figure $12,500 as the total fee for the appeal. The sum of the down payment and the seven monthly payments, however, equals $12,000, and we therefore assume the declaration was inaccurate in this regard.

[2] We may infer from the payment schedule included in the retainer agreement that the Carruth firm continued to accept monthly payments from petitioner's family after the appeal was dismissed in January 1992.

November 1991, the court sent a copy of petitioner's record to Appellate Defenders, Inc. (hereafter Appellate Defenders), a court-appointed counsel appellate project that assists indigent appellants attempting to seek relief in the Fourth District Court of Appeal. It is unclear why the Court of Appeal sent the record to Appellate Defenders because that entity had not been appointed to handle petitioner's appeal. In any event, the record remained in the possession of Appellate Defenders until it was located and obtained by petitioner's present counsel, Michael Totaro, in 1993. Petitioner says he was unaware that his record was being held by Appellate Defenders, and does not recall ever having received correspondence from anyone associated with the organization.

Totaro states he received a letter from Appellate Defenders explaining that, during the pendency of petitioner's appeal, Appellate Defenders had attempted to locate petitioner but received no response to its letters. The letter indicates further that Appellate Defenders could not determine where its letters to petitioner were actually sent. Apparently, without a signed request from petitioner for appointment of counsel, Appellate Defenders was unable to take any action on his behalf.

On December 27, 1991, pursuant to California Rules of Court, rule 17(a), the Court of Appeal mailed petitioner a notice that the appeal would be dismissed if an opening brief was not filed within 30 days. No brief was filed, and the court ordered petitioner's appeal dismissed. Petitioner was sent copies of the court's dismissal order and of the remittitur that issued on April 3, 1992.

Petitioner admits receiving various notices from the court concerning his appeal, but also states that when he attempted to call the Carruth firm about the notices, he was unable to speak with anyone in the office. He asserts that when his appeal was dismissed, he knew that he did not personally have the funds to hire another attorney and did not believe he could have one appointed at that late date. Although he was not aware of the specific terms of the retainer agreement between his family and the Carruth office, petitioner says he knew his family had already spent a great deal of money on his behalf, and he felt he could not ask them for further financial support.

Valdepena states that between September 1991 and November 1992, she continually called the Carruth firm to check on the status of petitioner's appeal, and was repeatedly told that the office had not received any information from the Court of Appeal. This information was accurate because, as the docket entries in the Court of Appeal record confirm, no one in the Carruth firm had lodged a substitution of attorney form with the court.

In November 1992, petitioner was transferred from Folsom State Prison to Pelican Bay State Prison. Valdepena states that shortly after petitioner's transfer, she received a box of his prison belongings and therein discovered the January 1992 notice of dismissal. She immediately called Carruth's office.

By this time, however, Carruth had sold his legal practice to Barry Bernstein. Although petitioner's case was not among those on the list of cases Bernstein had acquired from Carruth, a search of the Carruth firm's retainer logs revealed a record of the retainer agreement between petitioner's family and the firm. On December 8, 1992, Bernstein associated Totaro, petitioner's present counsel, to attempt to salvage the case. The next day, Totaro filed a motion to recall remittitur, vacate dismissal, and reinstate the appeal.

On March 16, 1993, the Court of Appeal denied the motion, concluding that petitioner was not diligent in protecting his right to appeal. The Court of Appeal focused on the fact petitioner had received notices that his appeal would be dismissed if an opening brief was not filed, and that nearly one year had elapsed between the time the appeal was dismissed and the time the motion to recall the remittitur was filed.

Petitioner then sought reinstatement of his appeal by filing a petition for a writ of habeas corpus in the Court of Appeal on November 1, 1993.[3] In its November 22, 1993, summary denial of this petition, the court briefly reiterated its earlier conclusion that petitioner had failed to exercise diligence and take the necessary action to protect his right to appellate review.

Petitioner then filed a petition for review in this court. After receiving and considering informal opposition and petitioner's reply, on February 3, 1994, we granted the petition for review and, with a citation to *In re Martin* (1962) 58 Cal.2d 133 [23 Cal.Rptr. 167, 373 P.2d 103] (hereafter *Martin*),[4] transferred the matter to the Court of Appeal with directions to vacate its summary denial of the petition for writ of habeas corpus, and issue an order to show cause returnable before that court. Accordingly, on February 15,

---

[3]Petitioner's niece states that in March 1993 she first attempted to get a refund of the money paid to the Carruth firm, and that sometime in August 1993 she received $5,000 with a promissory note for $1,200 a month payments on the balance due. She explains that she could not retain another attorney to act on petitioner's behalf until a portion of the money paid to the firm had been returned. (She also relates that she has received no further payments on the promissory note.)

[4]In *Martin*, we determined that the petitioner was entitled to reinstatement of his dismissed appeal in relevant part because he was not personally responsible for the dismissal. (*Martin*, *supra*, 58 Cal.2d at p. 137.)

1994, the Court of Appeal ordered the Director of Corrections to show cause why the remittitur in petitioner's appeal should not be recalled, the order dismissing petitioner's appeal should not be vacated, and petitioner's appeal should not be reinstated.

In a letter dated March 4, 1994, the Attorney General, representing the Department of Corrections, informed the court that respondent did not oppose the reinstatement of petitioner's appeal and declined to file a return to the order to show cause. The Court of Appeal denied petitioner's request that the show cause hearing be taken off calendar in light of respondent's nonopposition.

Thereafter, in a written opinion, the Court of Appeal denied the petition for a writ of habeas corpus. The court concluded that petitioner displayed no diligence in protecting his right to appeal, and found implausible petitioner's assertion that he had unsuccessfully attempted to contact his attorneys concerning the status of his appeal. In further support of its conclusion, the Court of Appeal determined that petitioner's remaining excuses were inadequate and insincere.

Petitioner again sought our review of the Court of Appeal's judgment, and we granted his second petition for review.

## II. DISCUSSION

■ The writ of habeas corpus may be used by a defendant lawfully in custody to seek relief from default in perfecting an appeal. (*Martin, supra,* 58 Cal.2d at p. 141; *In re Vallery* (1992) 3 Cal.App.4th 1125, 1130 [5 Cal.Rptr.2d 74].) If a petitioner applies for a writ of habeas corpus with the Court of Appeal and is denied relief, he or she may request review by this court of the adverse determination. (Pen. Code, § 1506.)

■ Petitioner seeks reversal of the Court of Appeal's judgment denying relief on his uncontested habeas corpus petition. He contends that because the People declined to file a return to the order to show cause or otherwise dispute his factual allegations, the Court of Appeal was not entitled to make findings of fact adverse to him. According to petitioner, the Court of Appeal's substitution of its own findings of fact for the uncontested facts set forth in the petition was improper and infected the court's decision to deny him relief. As we shall explain, petitioner's argument is only partly correct.

■ Our direction to an appellate court to issue an order to show cause why the relief sought in the petition should not be granted does not, as

petitioner contends, *establish* a prima facie determination that petitioner is entitled to the relief requested. Rather, it signifies our *"preliminary determination* that the petitioner has made a prima facie statement of specific facts which, if established, entitle [petitioner] to habeas corpus relief under existing law." (*In re Hochberg* (1970) 2 Cal.3d 870, 875, fn. 4 [87 Cal.Rptr. 681, 471 P.2d 1], italics added; see *People* v. *Duvall* (1995) 9 Cal.4th 464, 475 [37 Cal.Rptr.2d 259, 886 P.2d 1252]; *In re Sassounian* (1995) 9 Cal.4th 535, 547 [37 Cal.Rptr.2d 446, 887 P.2d 527].)

As a practical matter, the issuance of the order to show cause creates a "cause" giving the People a right to reply to the petition by a return and to otherwise participate in the court's decisionmaking process. (*People* v. *Pacini* (1981) 120 Cal.App.3d 877, 884 [174 Cal.Rptr. 820].) It is the interplay between the return and the petitioner's response to the return in a pleading called the traverse, that frames the issues the court must decide in order to resolve the case. (*People* v. *Duvall, supra,* 9 Cal.4th at p. 478; *People* v. *Romero* (1994) 8 Cal.4th 728, 739 [35 Cal.Rptr.2d 270, 883 P.2d 388]; *In re Hochberg, supra,* 2 Cal.3d at p. 876, fn. 4.)

■ As we explained in *People* v. *Romero,* "Once the issues have been joined in this way, the court must determine whether an evidentiary hearing is needed. If the written return admits allegations in the petition that, if true, justify the relief sought, the court may grant relief without an evidentiary hearing. [Citations.] Conversely, consideration of the written return and matters of record may persuade the court that the contentions advanced in the petition lack merit, in which event the court may deny the petition without a hearing. [Citations.] Finally, if the return and traverse reveal that petitioner's entitlement to relief hinges on the resolution of factual disputes, then the court should order an evidentiary hearing." (8 Cal.4th at pp. 739-740.)

■ If the People do not file a return, they forgo the opportunity to participate in the court's determination of the merits of the petitioner's claim. (*People* v. *Pacini, supra,* 120 Cal.App.3d at p. 884.) If, as occurred in this case, the People indicate to the court that they do not oppose the relief sought by the petitioner, and if they decline to file a return in response to the order to show cause, then no disputed factual questions exist for resolution. Under these circumstances, it would be proper for the court to accept as true the petitioner's undisputed factual allegations in the absence of a reference hearing, and to decide the merits of the case accordingly. (Cf. *In re Fields* (1990) 51 Cal.3d 1063, 1070, fn. 2 [275 Cal.Rptr. 384, 800 P.2d 862].) As we explain, however, although the court may properly *accept* the petitioner's allegations as true in the absence of an evidentiary hearing when a return is

not filed, with limited exception, the court should not *reject* the petitioner's undisputed factual allegations on credibility grounds without first conducting an evidentiary hearing.

■ The issuance of an order to show cause, anticipating the interplay between a return by the People and a traverse by the petitioner, both sets into motion the process by which the issues are framed for judicial determination (*People* v. *Duvall, supra,* 9 Cal.4th at p. 477), and affords the petitioner the opportunity to present additional evidence in support of the truth of the allegations in the petition. (*Id.* at p. 480; see also *In re Clark* (1993) 5 Cal.4th 750, 781, fn. 16 [21 Cal.Rptr.2d 509, 855 P.2d 729]; *In re Hochberg, supra,* 2 Cal.3d at p. 876, fn. 4.) This is significant because it is the *petitioner* who bears the ultimate burden of proving the factual allegations that serve as the basis for his or her request for habeas corpus relief. (See *People* v. *Duvall, supra,* 9 Cal.4th at p. 474; *In re Sassounian, supra,* 9 Cal.4th at p. 546.)

If the People decline to file a return, and the court *accepts* the undisputed factual allegations of the petition as true, petitioner has in effect been relieved of the burden of proving the factual allegations set forth in the petition. But when, under similar circumstances, the court *rejects* the petitioner's undisputed factual allegations on credibility grounds, and does so in the absence of an evidentiary hearing, the petitioner is deprived of the opportunity to present additional evidence in support of the undisputed allegations underlying the claim for relief. (See *In re Hochberg, supra,* 2 Cal.3d at p. 876, fn. 4.)

■ We recognize that, in some cases involving a petitioner's request for reinstatement of a dismissed appeal, the record, including the Court of Appeal's own internal documents, will contain facts refuting the allegations made in the petition. Under such circumstances, the court is justified in making a credibility determination adverse to the petitioner. (Cf. *In re Romero, supra,* 8 Cal.4th at p. 739 [considerations of return and matters of record may convince court that petition lacks merit].) But, unless the court's own records contradict the undisputed facts alleged in the petition, credibility determinations should not be made, in the absence of a return and traverse, without first ordering an evidentiary hearing.

Here, the Court of Appeal rejected petitioner's undisputed factual allegations solely on the basis of a credibility determination, and in the absence of a return, a traverse, and an evidentiary hearing. Specifically, the court found "implausible on its face" petitioner's statement that he attempted to call his attorneys but was never able to speak with anyone in the office. The court also doubted the good faith of petitioner's other allegations concerning his

lack of funds, his belief that counsel could not be appointed at such a late date, and his frustration.

Without an evidentiary hearing, however, petitioner was unable to provide the court with additional evidence tending to show the truth of his allegations. Had an evidentiary hearing been held, petitioner could have responded to the Court of Appeal's disbelief concerning his attempts to call his attorneys. As he suggests in his brief in this court, inmates in state prison are required to make collect calls to reach persons outside the institution, and it is certainly possible the Carruth law office refused to accept the collect calls of an inmate.

Whether a different outcome would have resulted if the Court of Appeal had held an evidentiary hearing in this matter is uncertain. Rather than return the case to the Court of Appeal a second time to conduct an evidentiary hearing, we will exercise our independent appraisal of the habeas corpus petition and supporting documents, and will accept petitioner's undisputed factual allegations as true. (See *In re Alvernaz* (1992) 2 Cal.4th 924, 944-945 [8 Cal.Rptr.2d 713, 830 P.2d 747]; *In re Hochberg, supra,* 2 Cal.3d at pp. 876-877.) We thus proceed to decide the merits of the issue presented in the petition, "dispos[ing] of [petitioner's claims] as the justice of the case may require." (Pen. Code, § 1484.) As we shall explain, based on the unusual circumstances surrounding the dismissal of petitioner's appeal, the equities of this case lie in favor of granting petitioner's request for relief.

Petitioner's family agreed to pay the law firm of A. Brent Carruth a retainer fee of $12,000 in return for the firm's representation of petitioner on appeal. The family satisfied its obligation in a timely fashion. The Carruth firm, however, did nothing to prosecute petitioner's appeal.

From September 1991 until November 1992, under the reasonable belief that retained counsel was competently performing its part of the agreement, petitioner's niece, Valdepena, continually called the Carruth office to check the status of her uncle's appeal. When she discovered, in November 1992, that the firm had done nothing to prosecute petitioner's appeal, Valdepena immediately called the Carruth office seeking an explanation, only to learn that the firm had been sold to another attorney and that petitioner's appeal was not included on the list of cases acquired in that transaction. Shortly thereafter, when further search of firm records revealed the existence of the retainer agreement between the Carruth office and petitioner's family, a motion to recall remittitur, vacate dismissal, and reinstate the appeal was filed without delay in the Court of Appeal. When that motion was denied, Valdepena attempted from March 1993 until August 1993 to obtain a refund

of the $12,000 paid in vain to the Carruth firm. Upon receipt of a partial refund of $5,000, Valdepena hired present counsel to file the petition for writ of habeas corpus at issue here.

In light of these facts, and our express policy that, if possible, appeals should be heard and decided on the merits (*Martin, supra*, 58 Cal.2d at p. 139), we believe that petitioner is entitled to the reinstatement of his appeal.

■ Petitioner makes the further request, in the event his appeal is reinstated, that the matter be transferred to this court or to an appellate court other than Division Two of the Fourth Appellate District. He claims that unless his appeal is transferred, he cannot receive a full and fair review of his assignments of error. This court may transfer a cause from a Court of Appeal to this court, or from one Court of Appeal to another, or from one division to another. (Cal. Rules of Court, rule 20(a).) We find, however, that the grounds on which petitioner seeks a transfer do not warrant such action.

Petitioner contends that Division Two of the Fourth Appellate District has demonstrated apparent, if not actual, bias by making factual findings adverse to him in the absence of a disputed factual issue, and by refusing to reinstate his appeal in spite of our order contemplating reinstatement of his appeal and a letter from the Attorney General expressing nonopposition to the relief sought by petitioner. As previously noted, however, our order to the Court of Appeal directing it to issue an order to show cause represented only our *preliminary* determination that the petitioner had stated sufficient facts that, if established, would entitle him to relief. Furthermore, it is unclear what effect, if any, the Attorney General's nonopposition should have on the court's ultimate resolution of the claims presented by the petition. Although we have determined herein that the Court of Appeal should have conducted an evidentiary hearing prior to making factual findings adverse to petitioner under the unusual circumstances of this case, it does not necessarily follow, nor has petitioner set forth any basis for concluding, that the court's judgment was motivated by bias against him. We therefore deny petitioner's request that his appeal be transferred to a different court.

### III. CONCLUSION

We conclude that petitioner is entitled to the relief sought in his petition for habeas corpus. The judgment of the Court of Appeal denying the writ of habeas corpus is reversed, and the matter remanded to that court with directions to recall its remittitur, vacate its order dismissing petitioner's appeal, and reinstate the appeal. In order to avoid further delay in this matter, we further direct the Court of Appeal to accept the petition for writ

of habeas corpus filed on November 1, 1993, as petitioner's opening brief on the merits of his appeal, with the opportunity to amend as necessary.

Mosk, J., Kennard, J., Arabian, J., and Werdegar, J., concurred.

**GEORGE, J.,** Dissenting.—I respectfully dissent from the majority's conclusion that, "based on the unusual circumstances surrounding the dismissal of petitioner's appeal, the equities of this case lie in favor of granting petitioner's request for relief." (Maj. opn., *ante,* at p. 457.) Petitioner's request to reinstate his appeal was addressed to the sound discretion of the Court of Appeal. (*Lundy* v. *Lakin* (1949) 89 Cal.App.2d 849, 850 [202 P.2d 369], cited with approval in *Mattz* v. *Superior Court* (1988) 46 Cal.3d 355, 361 [250 Cal.Rptr. 278, 758 P.2d 606]; *O'Connell Gold Mines, Ltd.* v. *Baker* (1943) 60 Cal.App.2d 777, 779 [141 P.2d 785].) Accordingly, the issue before us is *not* whether the "equities" of this case favor reinstatement of petitioner's appeal, but instead whether the Court of Appeal abused its discretion in denying petitioner's request for such relief. I conclude that the Court of Appeal, in reliance upon our decision in *In re Martin* (1962) 58 Cal.2d 133 [23 Cal.Rptr. 167, 373 P.2d 103], properly exercised its discretion in denying petitioner's request.

In its rush to rescue petitioner from the perceived harshness of the denial of appellate review under the circumstances of this case, the majority—glossing over the reality that petitioner, by his own inaction over a lengthy period of time, relinquished his right of appeal—has created bad law as well as a conflict with our decision in *In re Martin, supra,* 58 Cal.2d 133. I have no doubt that today's decision will plague the Courts of Appeal in their efforts to exercise proper discretion in future cases, and ultimately will come back to haunt us in the form of petitions seeking our review of decisions in which the intermediate appellate court has had the temerity to weigh the equities against a delinquent appellant.

In *In re Martin, supra,* 58 Cal.2d 133, private counsel was retained to appeal the petitioner's criminal conviction. Counsel filed a notice of appeal but took no further action, other than to request an extension of time to file the appellant's opening brief, and the appeal subsequently was dismissed. While the appeal in that case was pending, and continuing after its dismissal, the petitioner made "a sincere effort to ascertain the status thereof," including making "repeated efforts to communicate with his attorney" and sending two letters to the Court of Appeal. (*In re Martin, supra,* 58 Cal.2d at p. 136.) After being informed of the dismissal, he again attempted to contact his attorney and wrote to the State Bar and the Court of Appeal. (*Id.* at pp. 136-137.)

This court held: "[T]he question here is not the misconduct, if any, on the part of the attorney, but rather whether petitioner had knowledge that his appeal was not being prosecuted and with that knowledge stood by without taking action to preserve it." (*In re Martin, supra,* 58 Cal.2d at p. 137.) The opinion in *Martin* later describes this issue as whether the petitioner in that case "himself was in any way responsible, either personally or acting through his attorney, for the delay which resulted in the default . . . ." (*Id.* at p. 141.) We determined that the petitioner was entitled to relief, noting that he "is innocent of any personal fault for the dismissal of his appeal" and "cannot be charged with consent to or even knowledge of the abandonment [of his appeal] in the instant circumstances." (*Id.* at p. 137.)

The present case differs from *Martin* in several significant respects. Unlike Martin, petitioner in the present case was aware of the exact status of his appeal at every stage. Because he filed the notice of appeal in propria persona, and his attorney failed to substitute himself as counsel, the Court of Appeal sent all notices directly to petitioner. On November 7, 1991, the Court of Appeal mailed to petitioner at Folsom State Prison a notice informing him that the record on appeal had been filed and that his opening brief was due within 40 days. (Cal. Rules of Court, rule 37(a).) When no brief was filed, a notice was mailed to petitioner on December 27, 1991, pursuant to California Rules of Court, rule 17(a), informing him that the appeal would be dismissed in the event his opening brief was not filed within 30 days. (*Id.,* rules 17(a), 17(c).) On January 29, 1992, the Court of Appeal mailed to petitioner a notice indicating that his appeal had been dismissed because no brief had been filed. The Court of Appeal also mailed to petitioner a copy of the remittitur that issued on April 3, 1992.

Petitioner, in his declaration in support of the present petition, admits having received "various notices from the court regarding [his] appeal . . . ." Apparently prompted by these notices, petitioner states he "attempted to call [his] attorneys but was never able to speak with anyone in the office." Petitioner acknowledges having been aware that his appeal was dismissed, and attempts to explain why he took no action, even when notified that his appeal had been dismissed: "[A]fter the appeal was dismissed I was extremely frustrated because my family had spent a great deal of money they didn't have and it seemed like it was going to go to waste. I did not feel I could ask them for more money to help me."

When petitioner received notice, mailed on December 27, 1991, that an opening brief had not been filed and the appeal would be dismissed unless a

brief was filed within 30 days, he certainly had cause for concern. When petitioner subsequently received a notice, mailed on January 29, 1992, that his appeal had been dismissed, it was incumbent upon him to take some action, such as contacting his attorneys, his family (who had hired his attorneys), or the Court of Appeal. But the only indication that he took any action is the vague reference in his declaration that he "attempted to call [his] attorneys but was never able to speak with anyone in the office." Petitioner does not state at what point he attempted to telephone his attorneys, how many attempts he made, or why he was unsuccessful in contacting his attorneys. The foregoing leads to the inescapable conclusion that, at the least, he was aware his appeal had been dismissed but, in contrast to the petitioner in *In re Martin*, *supra*, 58 Cal.2d 133, took no significant action to remedy the situation.

Focusing upon the efforts of petitioner's niece to secure effective appellate representation for petitioner, the majority fails to acknowledge petitioner's personal responsibility to act diligently to protect his right of appeal. Initially, petitioner believed he was represented by counsel and, even after receiving notice that the appeal would be dismissed if no brief were filed, still might have believed (giving him the benefit of the doubt) that his attorneys would fulfill their responsibilities. But when petitioner received notice that his appeal had been dismissed, he no longer reasonably could believe that his attorneys were prosecuting the appeal. In fact, petitioner admits as much in his declaration. Still, he took no significant action. The present request to reinstate the appeal was made only after his niece, by happenstance, discovered the order of dismissal some 10 months after the appeal was dismissed, while going through a box of his personal effects sent from the prison when petitioner was transferred from Folsom State Prison to Pelican Bay State Prison.

An appellant's unreasonable delay following dismissal of an appeal constitutes a ground for denying reinstatement of the appeal. (See *Ellenberger* v. *City of Oakland* (1946) 76 Cal.App.2d 828, 836 [174 P.2d 461] [A motion to recall a remittitur "must be promptly made, and . . . unexplained delay is itself sufficient to deny the relief. [Citations.]"]; *Gutelius* v. *General Electric Co.* (1940) 39 Cal.App.2d 292, 294 [102 P.2d 1108].) Otherwise, an appellant could seek reinstatement years after an appeal was dismissed. In my view, the Court of Appeal did not abuse its discretion in finding that petitioner's delay of 10 months in seeking reinstatement of the appeal following the dismissal was unreasonable under the circumstances of the present case. Accordingly, I conclude that the Court of Appeal did not err in denying petitioner's request for reinstatement of his appeal, and I would

affirm the judgment of that court denying the petition for writ of habeas corpus.

Baxter, J., concurred.