[No. B191958. Second Dist., Div. Two. Apr. 12, 2007.]

In re SARA JANE OLSON on Habeas Corpus.

C**OUNSEL**

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Jennifer A. Neill and J. Conrad Schroeder, Deputy Attorneys General, for Appellant State of California.

David A. Nickerson; Kinsella, Weitzman, Iser, Kump and Aldisert and Shawn Chapman Holley for Respondent Sara Jane Olson.

O**PINION**

**DOI TODD, J.**—Respondent Sara Jane Olson, previously known as Kathleen Soliah, committed two 1975 Los Angeles felony destructive device or explosive offenses punishable under the indeterminate sentence law (ISL). In 1999, she was apprehended, and in 2001 and 2003, she pled guilty to these offenses and to an additional offense, a 1975 Sacramento County second degree murder. She was committed to state prison for the three offenses for the terms prescribed by law. Presently, she is imprisoned in the custody of James E. Tilton, the Secretary of the California Department of Corrections and Rehabilitation.[1]

Penal Code section 1170.2[2] authorizes the Board of Prison Terms (the Board) to translate a prisoner's ISL term into a retroactive term under the Uniform Determinate Sentencing Law of 1976 (DSL) to afford the prisoner an earlier release where the expiration of the DSL term occurs earlier than the prisoner's ISL parole release date. (See *In re Greenwood* (1978) 87 Cal.App.3d 777, 783–784 [151 Cal.Rptr. 223].) Initially, the Board calculated Olson's DSL term for her Los Angeles convictions under section 1170.2, subdivision (a). Shortly thereafter, the Board gave Olson timely notice it

---

[1] Operative on July 1, 2005, the Legislature reorganized the California Department of Corrections. It created a new department, the California Department of Corrections and Rehabilitation, which is directed by a secretary, presently, James E. Tilton. It abolished the Board of Prison Terms and put in place a new agency, the Board of Parole Hearings. The Board of Parole Hearings has the same duties and functions with respect to adult term setting and parole release decisions as its predecessor. (Pen. Code, §§ 5075, 5075.1, 3041; Gov. Code, §§ 12838, 12838.4, added or amended by Stats. 2005, ch. 10, §§ 6, 29, 46, 47, pp. 1–21, eff. May 10, 2005, operative July 1, 2005.) The Legislature has not amended the provisions of Penal Code section 1170.2 in conformity with the other sections amended upon reorganization.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

intended to calculate an "extended term" for her Los Angeles convictions pursuant to subdivision (b) of section 1170.2. That provision permits the Board to calculate a longer term of imprisonment where a strict translation of the ISL parole release date or the ISL term into a DSL term results in a windfall to the prisoner based on the criminal conduct he has committed.

On October 16, 2002, and September 7, 2004, the Board held serious offender hearings to calculate the extended term for Olson's Los Angeles convictions. It set an extended term for the Los Angeles convictions, respectively, at 14 years and then 13 years. After each hearing, Olson challenged the terms by petitions for writs of habeas corpus filed in the superior court. Ultimately, she obtained an order from the Los Angeles Superior Court requiring the Board to calculate her ISL parole release date, as well as her DSL extended term, at her serious offender hearing. She also obtained a one-year reduction in the DSL calculation of her extended term, thereby reducing her total DSL term of confinement for all convictions to 14 years.

The appeal challenges the superior court's orders striking one year of the extended term and ordering the Board to calculate Olson's parole release date under ISL guidelines. The contentions are as follows: (1) the superior court failed to comply with section 1473 et seq. by granting Olson relief without issuing an order to show cause (OSC), and the procedural flaw renders the superior court's orders a nullity; (2) the superior court erred in interpreting subdivision (c) of section 1170.2 because until there is a finding of section 3041 parole suitability, the Board has no duty to determine the ISL maximum discharge date and ISL parole release date; (3) the petition failed to demonstrate a prima facie case entitling Olson to relief as she failed to show that it is likely her ISL discharge and parole release dates will occur before the expiration of her DSL extended term; and (4) the superior court improperly struck one year of the DSL extended term because the one-year extension is justified by Olson's concurrent prison commitment for the murder, an offense she committed prior to committing the Los Angeles offenses.

■ We agree with appellant that the superior court improperly failed to issue an OSC and failed to have appellant file a return to the petition before granting Olson affirmative relief. Accordingly, we reverse the superior court's orders. Because of the procedural flaw, this court has no facts, issues or cause before it and cannot address the other contentions.[3]

---

[3] On January 16, 2007, Olson filed a petition for a writ of habeas corpus in this court, *In re Olson*, B196094. In the petition, she asked this court to review the claims she raised in the superior court for which she was denied relief. On January 22, 2007, this court ordered her habeas corpus petition considered concurrently with the instant appeal. We will dispose of the habeas corpus petition by a separate order.

## THE FACTS

To put the superior court's orders in context, we set out the facts that might have been established had the superior court properly issued an OSC and complied with section 1473 et seq.

### I. *Olson's Crimes and Arrest*

The probation report prepared by the Los Angeles County Probation Department indicates that in 1975 Olson was an active member of the Symbionese Liberation Army (the SLA). This terrorist organization is best known for kidnapping Patricia Hearst. Olson was not yet involved with the SLA when Hearst was kidnapped or when it engaged in a Los Angeles shootout with the police in which most of its members were killed. But shortly thereafter, when Bill and Emily Harris and Patricia Hearst returned to San Francisco, Olson joined the SLA.

In April 1975, Olson participated in two Sacramento County bank robberies committed to fund SLA's terrorist activities. During the Carmichael bank robbery, Emily Harris shot a bank customer. The SLA robbers prevented the bank hostages from assisting the wounded woman, and she later died. During the robbery, Olson entered the bank armed with a firearm and kicked a nonresisting, pregnant teller in the stomach. The teller miscarried after the robbery. Later that year, the SLA committed two bombings in the San Francisco area, and its members moved to Los Angeles.

In August 1975, in Los Angeles, the SLA members, including Olson, planted large and uniquely powerful pipe bombs under two Los Angeles police cars. Fortunately, when the officers in one car in Hollywood drove off, the bomb failed to detonate, and the officers saw it on the ground as they drove off. This police car had been parked directly in front of the windows of a House of Pancakes restaurant that was crowded with families with small children. An alert was issued, and two other police officers found an identical bomb beneath an unmarked police car parked near the Hollenbeck Police Station. Had the bombs exploded, they would have killed any officers in the police cars and injured or killed passersby in the vicinity.

Following the bombings, the Los Angeles County Grand Jury issued an indictment charging Olson with conspiracy and with the destructive device or explosive offenses.

Soon thereafter, the Harrises and Olson's brother, who was also associated with the SLA, were arrested. To avoid arrest, Olson left the state and for 26 years lived a law-abiding life in Minnesota and Europe under a false identity. She married an emergency room doctor, raised two daughters, and participated in school, church, and other community affairs.

Effective on July 1, 1977, the Legislature enacted the DSL.

In June 1999, Olson was arrested for the Los Angeles offenses and was returned to California.

## II. *The Legal Proceedings*

In 2001, in Los Angeles County, Olson pled guilty to two counts of attempting to ignite a destructive device or explosive. (§ 12308.)[4] She was sentenced to the terms prescribed by law for the offenses, which were two terms of 10 years to life. The trial court ordered the terms to be served consecutively. On May 23, 2002, Olson was received at the Central California Women's Facility at Chowchilla for her Los Angeles convictions.

In 2003, in Sacramento County, Olson pled guilty to second degree murder for the killing that occurred during the April 1975 Carmichael robbery. She was sentenced to the term prescribed by law, which was five years to life, to be served consecutively to the terms she was already serving.[5]

---

[4] Until July 1, 1977, section 12308 provided the following: "Every person who explodes, ignites, or attempts to explode or ignite any destructive device or any explosive with intent to commit murder is guilty of a felony, and shall be punished by imprisonment in the state prison for a period of not less than 10 years." (Stats. 1970, ch. 771, § 7, p. 1458, eff. Aug. 19, 1970.) Former section 671 provided that such punishment amounted to an indeterminate term of 10 years to life. (Stats. 1951, ch. 1674, § 1, pp. 3829–3830, eff. Sept. 22, 1951.)

Initially under the DSL, the three terms to be imposed for a violation of section 12308 were three, four and five years. (Stats. 1976, ch. 1139, § 315, p. 5165, eff. July 1, 1977.) Effective January 1, 1979, the punishment for section 12308 was increased to terms of five, seven and nine years. (Stats. 1978, ch. 579, § 44, p. 1997.) Effective on January 1, 1998, the Legislature increased the punishment for this offense to imprisonment in the state prison for life with the possibility of parole. (Stats. 1997, ch. 302, § 1, p. 97.)

[5] During the plea proceedings, the Sacramento County Superior Court said that although it was limited to sentencing Olson to the term prescribed by law, the parties' plea bargain contemplated that Olson would receive a six-year prison term for the murder.

In 1975, the punishment for second degree murder (§ 187, subd. (a)) was an indeterminate term of five years to life. (Stats. 1973, ch. 719, § 2, pp. 1297–1298.) Effective on July 1, 1977, the Legislature enacted DSL punishment for second degree murder as terms of five, six and seven years. (Stats. 1976, ch. 1139, § 133, p. 5098; Stats. 1977, ch. 316, § 5, p. 1256, eff. Aug. 11, 1977.) Effective on January 1, 1978, the Legislature increased the terms to five, seven and

After Olson was delivered to prison for her Los Angeles convictions, the Board translated her ISL term into a DSL term of five years four months pursuant to section 1170.2, subdivision (a). Soon thereafter, pursuant to section 1170.2, subdivision (b), the Board gave her notice that it was holding a serious offender hearing to extend her term. On October 16, 2002, it held the hearing and set her "extended term" at 14 years. (§ 1170.2, subd. (b).)[6]

Olson filed a petition for a writ of habeas corpus in the Sacramento County Superior Court contesting the use of the extended term and the calculation.

11 years. (Stats. 1978, ch. 579, § 2, p. 1981.) Effective November 8, 1978, the electorate put into effect Proposition 7, the so-called Briggs Initiative, which rewrote section 190. The new section 190 provided that the punishment for second degree murder was 15 years to life.

The petition fails to indicate the date of commitment for the Sacramento County conviction or the chronology for enhancing Olson's total term of confinement for her second degree murder conviction.

[6] Section 1170.2 provides as follows: "(a) In the case of any inmate who committed a felony prior to July 1, 1977, who would have been sentenced under Section 1170 if he or she had committed it after July 1, 1977, the Board of Prison Terms shall determine what the length of time of imprisonment would have been under Section 1170 without consideration of good-time credit and utilizing the middle term of the offense bearing the longest term of imprisonment of which the prisoner was convicted increased by any enhancements justified by matters found to be true and which were imposed by the court at the time of sentencing for such felony. . . .

"(b) If the calculation required under subdivision (a) is less than the time to be served prior to a release date set prior to July 1, 1977, or if a release date had not been set, the Board of Prison Terms shall establish the prisoner's parole date, subject to subdivision (d), on the date calculated under subdivision (a) unless at least two of the commissioners of the Board of Prison Terms after reviewing the prisoner's file, determine that due to the number of crimes of which the prisoner was convicted, or due to the number of prior convictions suffered by the prisoner, or due to the fact that the prisoner was armed with a deadly weapon when the crime was committed, or used a deadly weapon during the commission of the crime, or inflicted or attempted to inflict great bodily injury on the victim of the crime, the prisoner should serve a term longer than that calculated in subdivision (a), in which event the prisoner shall be entitled to a hearing before a panel consisting of at least two commissioners of the Board of Prison Terms as provided for in Section 3041.5. The Board of Prison Terms shall notify each prisoner who is scheduled for such a hearing . . . within 90 days of the date the prisoner is received by or returned to the custody of the Department of Corrections . . . . The hearing shall be held . . . within 120 days of receipt of the prisoner . . . . It is the intent of the Legislature that the hearings provided for in this subdivision shall be accomplished in the most expeditious manner possible. At the hearing the prisoner shall be entitled to be represented by legal counsel, a release date shall be set, and the prisoner shall be informed in writing of the extraordinary factors specifically considered determinative and on what basis the release date has been calculated. In fixing a term under this section the board shall be guided by, but not limited to, the term which reasonably could be imposed on a person who committed a similar offense under similar circumstances on or after July 1, 1977, and further, the board shall be guided by the following finding and declaration hereby made by the Legislature: that the necessity to protect the public from repetition of extraordinary crimes of violence against the person is the paramount consideration.

"(c) *Nothing in this section shall be deemed to keep an inmate in the custody of the Department of Corrections for a period of time longer than he would have been kept in its custody under the provisions of law applicable to him prior to July 1, 1977.* Nothing in this

The Sacramento Superior Court granted her partial relief and ordered a new serious offender hearing. The superior court ruled that the Board had abused its discretion by using the version of section 3046 that went into effect on November 8, 1978, after Proposition 7, as a guide for setting the length of the extended term and that the Board's interpretation of section 1170.2 conflicted with the provisions in subdivision (h) of that section.[7]

On September 7, 2004, the Board held a new serious offender hearing as directed. During that hearing, the Board recomputed Olson's extended term pursuant to the checklist the Community Release Board had used for calculating extended terms immediately after the DSL's effective date.[8] The Board calculated Olson's extended term for her Los Angeles convictions as 13 years.[9]

---

section shall be deemed to require the release of an inmate sentenced to consecutive sentences under the provisions of law applicable to him prior to July 1, 1977, earlier than if he had been sentenced to concurrent sentences. [¶] . . . [¶]

"(e) In the case of any inmate who committed a felony prior to July 1, 1977, who would have been sentenced under Section 1168 if the felony was committed on or after July 1, 1977, the Board of Prison Terms shall provide for release from prison as provided for by this code.

"(f) In the case of any inmate who committed a felony prior to July 1, 1977, the length, conditions, revocation, and other incidents of parole shall be the same as if the prisoner had been sentenced for an offense committed on or after July 1, 1977.

"(g) Nothing in this chapter shall affect the eligibility for parole under Article 3 (commencing with Section 3040) of Chapter 8 of Title 1 of Part 3 of an inmate sentenced pursuant to Section 1168 as operative prior to July 1, 1977, for a period of parole as specified in subdivision (b) of Section 3000.

"(h) In fixing a term under this section, the Board of Prison Terms shall utilize the terms of imprisonment as provided in Chapter 1139 of the Statutes of 1976 and Chapter 165 of the Statutes of 1977." (Italics added.)

[7] Before the serious offender hearing, Olson also filed a petition for a writ of mandate challenging the Board's jurisdiction to set an extended term. The Sacramento County Superior Court denied the petition. In its order, the superior court observed that the "only absolute limitation [on the Board's discretion] appears to be the ISL limit, which in this case is 20 years to life."

[8] The Community Release Board is the Board of Prison Terms' predecessor. Before July 1, 1977, the predecessor agencies to the Community Release Board were the Adult Authority and the Women's Board of Prison Terms and Parole.

[9] The Board calculated the extended term as having the following elements: a five-year upper term for one explosive offense; plus a subordinate term of one year eight months (one-third of an upper term of five years) for the other explosive offense; plus two years for the aggravating circumstance of "attempted great bodily injury"; plus one year for the aggravating circumstance that Olson had a "prior felony conviction that was not a prior prison term," i.e., four months before committing the explosive offenses, Olson participated in a bank robbery involving murder, and the murder did not serve to deter her from committing further acts of violence; plus one year four months for the aggravating circumstance that Olson was a fugitive from justice for over 20 years. At a subsequent time, the Board also added to Olson's extended term an additional subordinate term of two years (one-third of a term of six years) for Olson's Sacramento County murder conviction, making her total DSL term 15 years. Subsequently, the

### III. *The Writ Proceedings*

On May 27, 2005, Olson filed a petition for a writ of habeas corpus in Sacramento County, again challenging the use of the extended term and how the term was calculated. On July 11, 2005, the Sacramento Superior Court transferred the petition to the Los Angeles County Superior Court for hearing. On October 11, 2005, the petition was filed in the Los Angeles County Superior Court.

In the petition, Olson made five claims, which included the following: (1) the decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531] precluded the Board from extending her term beyond five years four months in the absence of jury findings beyond a reasonable doubt as to the aggravating factors, or her admission during her plea of such factors; (2) setting the 13-year extended term violated section 1170.2, subdivision (c), which provides that "[n]othing in this section shall be deemed to keep an inmate in the custody of the Department of Corrections for a period of time longer than he would have been kept in its custody under the provisions of law applicable to him prior to July 1, 1977," and under the ISL law, she would not have been held in custody for 13 years for her Los Angeles convictions; and (3) no evidence supported the Board's use of the second degree murder conviction to extend her term by one year, as that conviction did not qualify as a prior prison term within the meaning of section 667.5, subdivision (b).

On December 4, 2005, the superior court asked for an informal response to the petition, which appellant filed on January 27, 2006. On February 9, 2006, Olson filed her reply. The court asked for oral argument, but Olson declined. Then, without issuing an OSC or a writ and without ordering the filing of a return, the superior court issued orders on April 24, 2006, and May 10, 2006, granting Olson partial affirmative relief.

The superior court ordered the Board to strike one year of the extended term because there was no evidence permitting an extension of the term as Olson had not served a prior prison term within the meaning of section 667.5, subdivision (b). The court also ordered the Board to calculate Olson's release date under the ISL guidelines in effect prior to July 1, 1977. And, it directed the Board to compare the ISL parole release date to the DSL expiration of term and to release Olson on parole on the earliest of these dates.

---

Los Angeles Superior Court made the instant order, directing the Board to strike one year of that term, reducing her total DSL term to 14 years.

## DISCUSSION

I. *The Procedural Issue*

Appellant contends that the orders are without effect as the superior court failed to comply with section 1473 et seq. and with the procedures required by the decision in *People v. Romero* (1994) 8 Cal.4th 728 [35 Cal.Rptr.2d 270, 883 P.2d 388] (*Romero*). We agree.

 In *Romero*, the court held that in ordinary circumstances, a court must comply with section 1473 et seq., in ruling on a petition for habeas corpus. In particular, it must make a finding that a petitioner has made a prima facie case entitling him or her to relief and must issue an OSC before making orders granting the petitioner affirmative relief. (*Romero, supra*, 8 Cal.4th at pp. 737–738.)

The *Romero* court explained the reasons for requiring those procedures: The "issuance of a writ of habeas corpus or an order to show cause is an intermediate but nonetheless vital step in the process of determining whether the court should grant the affirmative relief that the petitioner has requested. The function of the writ or order is to 'institute a proceeding in which issues of fact are to be framed and decided.' (*In re Hochberg* [(1970)] 2 Cal.3d 870, 876, fn. 4 [87 Cal.Rptr. 681, 471 P.2d 1], italics omitted.) The issuance of either the writ of habeas corpus or the order to show cause creates a 'cause,' thereby triggering the state constitutional requirement that the cause be resolved 'in writing with reasons stated' (Cal. Const., art. VI, § 14; see *People v. Pacini* [(1981)] 120 Cal.App.3d 877, 884 [174 Cal.Rptr. 820]). Thus, the writ or order is the means by which issues are joined (through the return and traverse) and the need for an evidentiary hearing determined.

 "As the means by which a judicial proceeding is instituted, the issuance of the writ (or order to show cause) is mandatory, not optional. Penal Code section 1476 states that '[a]ny court or judge authorized to grant the writ, to whom a petition therefor is presented, . . . *must*, if it appear that the writ ought to issue, grant the same without delay . . . .' (Italics added.) This court has confirmed this statutory command: '[I]f a petition for habeas corpus makes a prima facie showing, then the opposing side *must* be given an opportunity to file a return to the petition.' (*Adoption of Alexander S.* [(1988)] 44 Cal.3d 857, 865 [245 Cal.Rptr. 1, 750 P.2d 778], italics added; see also *In re Sixto* [(1989)] 48 Cal.3d 1247, 1251–1252 [259 Cal.Rptr. 491, 774 P.2d

164]; *In re Lawler* [(1979)] 23 Cal.3d 190, 194 [151 Cal.Rptr. 833, 588 P.2d 1257]; *People v. Getty* [(1975)] 50 Cal.App.3d 101, 110–111 [123 Cal.Rptr. 704].)" (*Romero, supra*, 8 Cal.4th at p. 740, fn. omitted; see also, *In re Serrano* (1995) 10 Cal.4th 447, 454–456 [41 Cal.Rptr.2d 695, 895 P.2d 936].)

"The informal response contemplated by rule 60 [of the California Rules of Court] performs a screening function. (Cf. *Frias v. Superior Court* (1975) 51 Cal.App.3d 919, 924 [124 Cal.Rptr. 616] (conc. opn. of Friedman, Acting P. J.) ['Some kind of screening capability is essential to the sensible fulfillment of habeas corpus responsibility.'].) Through the informal response, the custodian or real party in interest may demonstrate, by citation of legal authority and by submission of factual materials, that the claims asserted in the habeas corpus petition lack merit and that the court therefore may reject them summarily, without requiring formal pleadings (the return and traverse) or conducting an evidentiary hearing. If the petitioner successfully controverts the factual materials submitted with the informal response, or if for any other reason the informal response does not persuade the court that the petition's claims are lacking in merit, then the court must proceed to the next stage by issuing an order to show cause or the now rarely used writ of habeas corpus." (*Romero, supra*, 8 Cal.4th at p. 742, fn. omitted.)

Olson argues that appellant's failure to object to the procedure followed by the superior court constitutes a forfeiture of the contention on appeal. She asserts that the superior court's orders asking for informal responses from the parties and its order extending the time for decision indicated that it was contemplating issuing relief without compliance with *Romero*. At no time did appellant object that compliance with the procedures mandated by *Romero* was a prerequisite to granting relief. Also, after the superior court issued relief without compliance with *Romero*, appellant again failed to object on procedural grounds and did not file a motion for reconsideration.

██ To support her forfeiture argument, Olson cites the decisions in *People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1056 [40 Cal.Rptr.3d 768], and *Gonzalez v. U.S.* (9th Cir. 1994) 33 F.3d 1047, 1049. These authorities do not address a forfeiture or waiver in the context of whether a court is entitled to grant a petitioner habeas corpus relief when no OSC issues. Indeed, in *Romero*, the court noted: "The right to file a return in a habeas corpus proceeding is subject to waiver. Upon being served with a copy of the petition, or upon receiving a request from the court for informal opposition under rule 60 of the California Rules of Court, the petitioner's custodian may

stipulate to the truth of the petition's allegations and to the requested relief. Should this occur, the court in which the habeas corpus petition is pending may grant relief without issuing a writ of habeas corpus or an order to show cause." (*Romero, supra*, 8 Cal.4th at p. 740, fn. 7.)

Here, there was no stipulation relieving the superior court of its duty to issue the OSC or the writ. Nor did the failure to object amount to the stipulation referred to in *Romero*. As such, we find no forfeiture or waiver.

Pursuant to *Romero*, we conclude that there are no facts, issues or cause before us. The superior court's orders are a nullity in the absence of the issuance of an OSC or a writ and in the absence of the filing of a return. Accordingly, we reverse the superior court's orders and remand the matter to the superior court so that it can reconsider the petition in conformity with the decisions in *Romero, supra*, 8 Cal.4th 728; *People v. Duvall* (1995) 9 Cal.4th 464, 474–486 [37 Cal.Rptr.2d 259, 886 P.2d 1252]; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 675 [128 Cal.Rptr.2d 104, 59 P.3d 174]; *In re Clark* (1993) 5 Cal.4th 750, 779 [21 Cal.Rptr.2d 509, 855 P.2d 729] and footnote 16; *In re Sixto, supra*, 48 Cal.3d at p. 1252; and *Board of Prison Terms v. Superior Court* (2005) 130 Cal.App.4th 1212, 1233–1237 [31 Cal.Rptr.3d 70].

## II. *The Merits*

Because there are no facts, issues or cause before us, this court cannot issue an opinion settling the dispute between the parties. (*In re Carpenter* (1995) 9 Cal.4th 634, 646 [38 Cal.Rptr.2d 665, 889 P.2d 985] ["[a]ppellate jurisdiction is limited to the four corners of the record on appeal"]; see also *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267 [62 Cal.Rptr.2d 437, 933 P.2d 1134]; *Romero, supra*, 8 Cal.4th at p. 740.) Consequently we will not address the merits.[10]

Nevertheless, on remand, the superior court may wish to consider the following in determining whether there is a prima facie case requiring the issuance of an OSC and whether Olson is entitled to affirmative relief.[11]

---

[10] During oral argument, counsel commented on undue delay. Counsel should consider that the issues in the petition are relatively complex and that it appears that all the participants in the matter, not just the superior court and the Board, are struggling to reach a proper resolution. Olson, as well as appellant, had the opportunity to raise the *Romero* issue in the superior court, and neither party objected so as to avoid a futile appeal. Furthermore, Olson's belated apprehension has contributed in large part to the delay as the Board no longer has the expertise it once had in calculating the terms for nonlife ISL prisoners.

[11] Any order issued by the superior court granting relief should be directed to the proper respondent in the superior court, James E. Tilton, Secretary of the California Department of Corrections and Rehabilitation.

(1) Should the court consider section 1170.2, subdivision (c), in the context of the statutory scheme as a whole, and particularly in connection with section 3041, which requires that a prisoner's ISL parole release date be determined only after the prisoner is found suitable for parole?[12]

(2) Notwithstanding section 1170.2, subdivision (c), does the current California Code of Regulations, title 15, section 2300 require the Board to calculate Olson's ISL parole release and discharge dates at the serious offender hearing?

(3) Do former sections 3024, subdivision (d), and 3049 define Olson's ISL minimum eligibility for parole? Does section 3046 apply to Olson in light of ex post facto principles, and is she a "life prisoner" under the relevant regulations? (Cal. Code Regs., tit. 15, § 2000; *People v. White* (1976) 16 Cal.3d 791, 794–796 & fn. 3 [129 Cal.Rptr. 769, 549 P.2d 537]; *In re Secada* (1978) 80 Cal.App.3d 39 [145 Cal.Rptr. 330].)

(4) Does the absence of allegations in the petition as to whether the Board has afforded Olson timely parole hearings affect Olson's entitlement to relief?

(5) Has Olson demonstrated the use of current law or the use of the current parole guidelines violates ex post facto principles pursuant to the decisions in *Garner v. Jones* (2000) 529 U.S. 244 [146 L.Ed.2d 236, 120 S.Ct. 1362], *California Dept. of Corrections v. Morales* (1995) 514 U.S. 499, 506–513 and footnote 3 [131 L.Ed.2d 588, 115 S.Ct. 1597], and *Collins v. Youngblood* (1990) 497 U.S. 37, 41 [111 L.Ed.2d 30, 110 S.Ct. 2715]?

(6) Would ordering a remand for a new serious offender hearing return Olson to her procedural posture on October 16, 2002, so that the Board may use all of her convictions, including the second degree murder conviction, to redetermine the extended term? (*In re Caudillo* (1980) 26 Cal.3d 623, 630–637 [164 Cal.Rptr. 692, 610 P.2d 1021].)

(7) Does the petition contain procedural flaws requiring a denial because of delay and the failure to attach a complete set of all versions of the parole guidelines that might apply? (*People v. Duvall, supra,* 9 Cal.4th at p. 474; *In re Clark, supra,* 5 Cal.4th at pp. 756, 782, 786.)

---

[12] Is section 1170.2's legislative history or the decision in *In re Rodriguez* (1975) 14 Cal.3d 639, 652–653 [122 Cal.Rptr. 552, 537 P.2d 384], of assistance in determining legislative intent?

## DISPOSITION

The Los Angeles County Superior Court's orders of April 24, 2006, and May 10, 2006, are reversed. The matter is remanded to the Los Angeles County Superior Court for further proceedings in conformity to the decision in *People v. Romero*, *supra*, 8 Cal.4th 728 and the other cases cited herein.

Boren, P. J., and Ashmann-Gerst, J., concurred.