[Nos. A114111, A118706. First Dist., Div. Three. July 21, 2008.]

In re INEZ TITO LUGO et al. on Habeas Corpus.

**COUNSEL**

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves and David S. Chaney, Chief Assistant Attorneys General, Julie Garland and Frances T. Grunder, Assistant Attorneys General, Jennifer A. Neill, Thomas J. Patterson, Rochelle C. East, Patricia Webber Heim and Damon G. McClain, Deputy Attorneys General, for Appellant the People.

Prison Law Office, Donald Specter; UnCommon Law and Keith Wattley for Respondents.

**OPINION**

**McGUINESS, P. J.**—The proceeding giving rise to these consolidated appeals began simply enough with a habeas corpus petition filed by a prisoner who claimed his parole suitability hearing had not been conducted within the time specified in the Penal Code.[1] From that modest beginning, the proceeding transmogrified into something unprecedented under California law—a habeas corpus class action on behalf of parole-eligible life prisoners in which the trial court has assumed a role as overseer of the Board of Parole Hearings (Board) on a range of matters far afield of the simple complaint that motivated the original petitioner to seek relief.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

On appeal, the Board claims the trial court erred by improperly limiting the Board's inherent discretion and requiring the Board to state "a significant change in circumstances" justifying a decision to deny parole for more than one year following a prior one-year parole denial. The Board further contends the trial court erred by requiring it to provide inmates with transcripts of their parole hearings within 30 days of the hearing date or face sanctions of $10 per day for each delayed transcript. Finally, the Board claims the trial court abused its discretion when it chose to multiply the fees awarded to class counsel by a factor of 1.5.

We affirm the order awarding attorney fees but reverse the trial court's orders as they relate to multiyear denials and hearing transcripts.

### FACTUAL AND PROCEDURAL BACKGROUND

On May 26, 2004, Jerry Rutherford filed an in propria persona habeas corpus petition in the Marin County Superior Court. Rutherford, a prisoner at San Quentin State Prison who was serving a seven-year-to-life sentence, complained that he had been given a one-year denial of parole on February 25, 2003, but that the Board had failed to conduct his subsequent parole consideration hearing within one year of that date, in violation of his due process rights and section 3041.5, subdivision (b)(2). The trial court issued an order to show cause, directed the Board to file a return, and appointed the Prison Law Office to represent Rutherford in connection with his petition.[2]

The Attorney General filed a return on behalf of the Board. Among other things, the Attorney General contended the action should be dismissed as moot because, at the time the return was filed, Rutherford's next parole consideration hearing had already been scheduled.

Rutherford filed a reply to the Board's return along with a notice of motion and motion for class certification. Because his parole hearing had yet to take place, Rutherford denied the issue presented in the petition was moot. He further argued that, even if his hearing took place as scheduled, the court should still address the issue of untimely parole hearings because it was

---

[2] The named respondent in the trial court action is the acting warden of San Quentin State Prison. Because the case challenges actions of the Department of Corrections and Rehabilitation (Department), which includes the Board of Parole Hearings, the proper respondent under sections 1474 and 1477 is the acting secretary of the Department. For the sake of simplicity and because the Board is the subject of the orders that are at issue on appeal, we shall in most instances refer to the respondent as "the Board."

capable of repetition while evading judicial review. With respect to the class certification issue, Rutherford contended the court was required to issue "broad prospective" relief on behalf of him and all similarly situated life prisoners entitled to a timely parole consideration hearing. He argued that the "current piecemeal approach to resolving disputes over hearing timeliness" was insufficient and a waste of judicial resources.

The Board opposed the class certification motion, arguing among other things that habeas corpus proceedings are not appropriate for class treatment, judicial intervention was unwarranted in light of legislative action intended to reduce the parole hearing backlog, and the putative class did not meet the criteria for certification. In its opposition, the Board cited an order denying relief in another, similar habeas corpus petition that came before a different trial judge on the Marin County Superior Court. That trial judge offered the following observation, which might well apply to this action: "The administrative problems and delays and the statutory scheme which makes the operations of the [Board] clearly a function of the executive branch of government, have created a morass uniquely inappropriate for judicial resolution."

The trial court granted Rutherford's motion for class certification on November 29, 2004. The court defined the class as all prisoners serving indeterminate terms of life with the possibility of parole who have approached or exceeded their minimum eligible parole dates without receiving their parole hearings within the time required by sections 3041 and 3041.5. In this opinion, we shall refer to the certified prisoner class collectively as petitioners.

Following certification of the class, the Board stipulated that it was not providing timely parole consideration hearings as required by the Penal Code. After the Board attempted but largely failed to reduce the hearing backlog, the court granted petitioners' application for a writ of habeas corpus by order dated February 15, 2006. The trial court found that the hearing backlog was "increasing at an alarming rate" and cited testimony attributing the delays to antiquated procedures and inadequate staffing. The court concluded that "the remedy of individual judges granting individual applications for writs of *habeas corpus* cannot adequately address this problem." The court ordered the Board to "take immediate measures to comply with the statutory time limits for holding parole hearings," appointed the Prison Law Office as class counsel for petitioners, directed class counsel to prepare and give notice to the class, and expressed its intention to adopt a remedial plan that would be "as minimally intrusive as possible" in light of the substantial deference given to the Department. The court's order also directed class counsel to file a noticed motion for reasonable fees.

On March 22, 2006, the parties filed a joint statement of disputed issues, stipulated procedures, and a remedial plan. The court approved the stipulated procedures the following day. The stipulated procedures provide in relevant part that the Board shall file a progress report on compliance with the remedial plan at least once every 90 days. Under the stipulated procedures, petitioners are authorized to move "for any relief permitted by law or equity" to the extent they are not satisfied with the Board's response to any issue raised about its compliance with the remedial plan. The procedures specify that the court retains jurisdiction to enforce the terms of its orders and further indicate the matter will not be dismissed until the hearing backlog had been reduced to not more than 5 percent of monthly hearings and remained at or below that level for twelve consecutive months.

The proposed remedial plan required the Department to eliminate the backlog of parole hearings within 18 months of the court's approval of the plan and to develop and implement a statewide, networked scheduling and tracking system for parole suitability hearings.

One of the disputed issues identified by the parties concerned multiyear denials of parole following a previous one-year denial of parole.[3] Petitioners took the position that the Board should not deny further parole consideration for two, three, four, or five years in cases in which inmates had previously received a one-year parole denial, absent a significant change in circumstances. The Board's position was that individual parole decisions should be left to the discretion of the hearing panel, which should not be bound by decisions of prior panels. The parties submitted further briefing on the issue of multiyear denials following a one-year denial.

Petitioners argued that the Board "seems to be using" multiyear denials to reduce the hearing backlog. As support for its position, petitioners claimed that some prisoners who had been denied parole for one year in the past were receiving multiyear denials.[4] In opposition, the Board pointed out there was no evidence that any of its commissioners had ever given a multiyear denial in order to reduce the hearing backlog. Further, the Board argued the issue of multiyear denials was not related to the timeliness of parole consideration hearings and therefore was not properly before the court. The Board also contended that requiring it to state a significant change in circumstances

---

[3] The consequence of a multiyear denial is that the next scheduled parole suitability hearing will not be conducted for another two to five years. (See § 3041.5, subd. (b)(2).) By contrast, when the Board issues a one-year denial, the matter is heard on an annual basis. (*Ibid.*)

[4] Petitioners supported their contention with 16 unverified "lifer poll" questionnaires completed by 16 inmates previously issued one-year denials who subsequently received multiyear denials. At most, the record contains evidence that some multiyear denials have followed prior one-year denials. Even that showing is questionable as an evidentiary matter because the 16 lifer polls submitted to the trial court are unverified.

justifying a multiyear denial following a one-year denial would improperly restrict the Board's discretion.

On April 14, 2006, class counsel filed a motion for an award of attorney fees. Class counsel sought $58,460 as reasonable attorney fees, an amount that class counsel argued should be multiplied by a factor of at least 1.5 in light of factors described in *Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303], that would justify a fee enhancement. Although the Board opposed the fee motion, it did not contest class counsel's contention that $58,460 constituted reasonable fees for the services provided. Instead, the Board contended that no multiplier was justified and that any fee award should be limited to $58,460.

By order dated May 5, 2006, the trial court ruled on a number of disputed issues, including the handling of multiyear denials and class counsel's request for attorney fees. On the issue of multiyear denials, the court ordered the Board "not to deny further parole consideration for more than one year in the case of prisoners who have formerly been denied for one year, in the absence of a significant change in circumstances, which must be stated on the record." At the hearing on the motion, the trial court had observed that petitioners offered "some anecdotal evidence" that prisoners were being given multiyear denials with no justification offered. With regard to the attorney fee motion, the court noted that the Board did not dispute class counsel's request for fees in the amount of $58,460. The court found that class counsel was entitled to an enhanced fee based on the factors identified in class counsel's moving papers as well as the factors identified in *Serrano v. Priest, supra,* 20 Cal.3d 25. The court found that a multiplier of 1.5 was appropriate and therefore arrived at an enhanced fee amount of $83,174.49.[5] Adding in costs and attorney fees associated with the fee motion itself (which were not enhanced by the 1.5 multiplier), the attorney fee and cost award totaled $90,203.72, which the court ordered the Board to pay to the Prison Law Office forthwith.

The court's May 5, 2006, order also appointed Inez Tito Lugo as the class representative in place of original petitioner Jerry Rutherford, who had died since the commencement of the litigation.

On June 5, 2006, the Board filed a timely notice of appeal (case No. A114111) from the court's May 5, 2006, order. At the request of the Board, we granted a writ of supersedeas and stayed enforcement of the following portions of the trial court's May 5, 2006, order pending consideration of the appeal: (1) the paragraph directing the Board "not to deny further

---

[5] The fee was calculated by taking the undisputed fee amount of $58,460, subtracting out the amount already paid directly to class counsel by Marin County ($3,010.34), and then multiplying the remaining unpaid fees ($55,449.66) by 1.5 to arrive at $83,174.49.

parole consideration for more than one year in the case of prisoners who have formerly been denied for one year, in the absence of a significant change in circumstances, which must be stated on the record"; and (2) the application of the 1.5 multiplier in the computation of the attorney fee award.

Throughout 2006, the parties continued to submit reports to the court concerning the progress that had been made toward remediating the parole hearing backlog. In a status report filed November 9, 2006, petitioners raised for the first time in the litigation the complaint that the Board was not providing parole hearing transcripts to inmates in a timely manner.[6] Petitioners argued that some prisoners were waiting months for their transcripts in spite of section 3042, subdivision (b), which they claimed requires the Board to provide a hearing transcript within 30 days of the hearing. Petitioners complained that the delay in receiving transcripts "presents a barrier to prisoners' access to the courts because they must attach a copy of the hearing transcript to any petition for writ of habeas corpus they may file to challenge any aspect of the hearing decision." Petitioners did not suggest the purported transcript backlog had any bearing on the timely provision of parole consideration hearings.

At a status conference on November 16, 2006, the Board's attorney told the court that efforts were being made to reduce the transcript backlog but also argued that the timely provision of hearing transcripts was beyond the scope of this litigation. The court initially reacted to the issue as follows: "Well, it's—it's kind of the same problem we have with the overdue parole hearings. We have laws on the books that say this is how it's supposed to be, and the Respondents, for all kinds of reasons, aren't doing it." The court stated that under section 3042, subdivision (b), an inmate "has a right to a transcript within 30 days." The court held that the issue of delayed hearing transcripts was within the purview of the court's jurisdiction because a hearing is not complete unless the transcript is furnished to the inmate. The court explained: "It's sort of a Zen concept: If there's no transcript, we don't know whether there was a hearing, and if so, what happened, and whether it was done properly."

At subsequent status hearings, the Board provided estimates regarding when the transcript backlog would be eliminated. Dissatisfied with the progress toward eliminating the backlog, petitioners argued in a brief filed

---

[6] The record on appeal reflects that the issue was first brought to the attention of the trial court in a letter dated September 18, 2006, from a prisoner incarcerated at Soledad State Prison. The prisoner attached a habeas corpus petition filed in the Monterey County Superior Court in which he objected to the delay in receiving his parole hearing transcript on behalf of a putative class of prisoners. In the cover letter, the prisoner stated he was sending the court a copy of his petition because the court was "already dealing with the BPH on a delay of hearings."

April 27, 2007, that the Board should be ordered to reduce the transcript backlog within 30 days. The Board responded by stating it was taking appropriate steps to eliminate the transcript backlog but noted that, in any event, there is no statutory requirement that transcripts be provided to inmates within 30 days of the hearing date, citing section 3042, subdivision (b) and a decision of the First District Court of Appeal in *In re Bode* (1999) 74 Cal.App.4th 1002 [88 Cal.Rptr.2d 536] (*Bode*). In *Bode*, Division Five of this court held that there is no 30-day statutory deadline for providing a life prisoner with a transcript of a parole hearing. (*Bode, supra,* 74 Cal.App.4th at p. 1003.) The appellate court in *Bode* held the 30-day requirement in section 3042, subdivision (b) was designed to protect the public before the release of a prisoner by giving members of the public access to parole hearing transcripts. (*Bode, supra,* 74 Cal.App.4th at p. 1003.)

The trial court below considered the transcript backlog issue at a hearing held on May 10, 2007. The court asked if the Board wished to address whether prisoners "aren't really entitled to transcripts within 30 days." The Board's attorney responded by arguing that *Bode* had already decided the issue and that the only requirement under that case was that inmates be provided with a transcript "within a reasonable amount of time to allow them to challenge any adverse ruling in their parole consideration hearing."

At the conclusion of argument on the issue, the court ordered the transcript backlog eliminated by June 15, 2007, and further ordered that a sanction of $10 per day per delayed transcript would be imposed following that date. The court further expounded upon its order with respect to prisoners, as follows: "As far as when prisoners should be getting transcripts, I've read the *Bode* case, I have great respect for the Justices who authored it, however, it's my reading of [section] 3042[, subdivision] (b) that Respondents are to prepare transcripts within 30 days of the hearing. [¶] . . . I believe prisoners are members of the public. I don't think members of the public have a greater or lesser right to those transcripts than prisoners. So the arguments that prisoners are not legally entitled to those within 30 days is an argument I disagree with. It's my reading of the statutes that they are entitled."

No formal signed order was entered following the hearing held on May 10, 2007. The minute order from the hearing reads, in pertinent part: "The court states transcripts are to issue 30 days after hearing. Prisoners are members of the public. Commencing 6/1/07 [*sic*] $10 per day per late transcript is ordered."

On May 30, 2007, the Board filed a timely notice of appeal (case No. A118706) from the trial court's May 10, 2007, minute order. At the Board's request, we granted a writ of supersedeas and stayed the following

provisions of the trial court's order pending consideration of the appeal: (1) the requirement that the Board eliminate the transcript backlog by June 15, 2007; (2) the imposition of a $10 per day per transcript penalty for transcripts delayed after June 15, 2007; and (3) the requirement that the Board provide hearing transcripts to inmates within 30 days of the hearing date.

On the court's own motion, we consolidated the appeal in case No. A114111 with the appeal in case No. A118706 for the purposes of argument and decision.

## DISCUSSION

### I. *Multiyear denials of parole*

The Board contends the trial court erred by ordering it not to deny further parole consideration for more than one year in the case of prisoners who had been formerly denied for one year, in the absence of a significant change in circumstances. The Board argues the court's order unlawfully limits the Board's discretion. We agree.

The challenged order is in the nature of an injunction. Ordinarily, when we review a trial court order granting injunctive relief, we apply the deferential abuse of discretion standard. (See *ReadyLink Healthcare v. Cotton* (2005) 126 Cal.App.4th 1006, 1016 [24 Cal.Rptr.3d 720].) A decision will be reversed for an abuse of discretion only when it exceeds the bounds of reason or disregards uncontradicted evidence. (*Ibid.*) The burden rests with the party challenging an injunction to make a clear showing of abuse. (*Ibid.*) However, when the issue raised on appeal concerning an injunction is purely legal, such as the proper interpretation and application of a statute or constitutional provision, our review is de novo. (See *Vo v. City of Garden Grove* (2004) 115 Cal.App.4th 425, 433 [9 Cal.Rptr.3d 257] [constitutional issues always reviewed de novo]; *Upland Police Officers Assn. v. City of Upland* (2003) 111 Cal.App.4th 1294, 1301 [4 Cal.Rptr.3d 629] [when injunction is based on trial court's statutory interpretation in light of undisputed facts, review is de novo].)

Here, the issues raised by the Board are purely legal in that it claims the court's order contravenes section 3041.5 and violates separation of powers principles found in the California Constitution. These purely legal issues do not require us to determine whether the court properly evaluated the evidence

in determining the need for relief.[7] Instead, the only issue is whether the court's form of relief violates state law. De novo review is therefore appropriate.[8]

■ Parole consideration procedures are governed by section 3040 et seq. and apply to all inmates not serving a determinate sentence. (*In re Jackson, supra*, 39 Cal.3d at p. 468.) If the Board concludes following a hearing that a life prisoner who is eligible for parole is not suitable for release on parole, the next hearing to consider parole suitability is normally scheduled for the following year. (*Ibid.*; § 3041.5, subd. (b)(2).) We have used the term "one-year denial" to refer to such a circumstance.

Section 3041.5, subdivision (b)(2) affords the Board discretion under certain circumstances to issue "multiyear denials," in which case the next scheduled parole hearing may be scheduled no later than the following: "(A) Two years after any hearing at which parole is denied if the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following year and states the bases for the finding. [¶] (B) Up to five years after any hearing at which parole is denied if the prisoner has been convicted of murder, and the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following years and states the bases for the finding in writing. If the board defers a hearing five years, the prisoner's central file shall be reviewed by a deputy commissioner within three years at which time the deputy commissioner may direct that a

---

[7] The issue before us is whether the trial court's order is inconsistent with statutory law and violates the constitutional separation of powers. While it may be true that the evidentiary showing offered by petitioners is insufficient to support any remedial order designed to enforce standards for issuing multiyear denials (see fn. 4, *ante*), our analysis would be insufficient and incomplete if we were to vacate the trial court's order solely on the ground there is insufficient evidentiary support for the requested relief. Instead, in light of the ongoing nature of this matter, we clarify that the particular form of relief ordered by the trial court is inconsistent with the relevant statute and intrudes upon the discretion afforded to the Board, irrespective of the state of the evidence.

We have no occasion to consider whether and to what extent relief may be afforded in a case in which an inmate has demonstrated a persistent violation of constitutional rights of large numbers of persons. Petitioners made no such constitutional claim in the trial court, but instead argued in effect that the Board was acting in a manner that constituted an abuse of discretion and violated statutory standards. On appeal, although petitioners make several references to "due process" in their brief, they have not offered a factual or legal showing that the purported actions taken by the Board rise to the level of a constitutional violation. (Cf. *In re Jackson* (1985) 39 Cal.3d 464, 474, 476, 477, fn. 12 [216 Cal.Rptr. 760, 703 P.2d 100] [while opportunity to be heard is important right, multiyear denials do not affect eligibility for parole but only the frequency of hearings, and statute contains safeguards to guarantee that any postponement decision will be well founded].)

[8] As a practical matter, the analysis and result would be no different under the abuse of discretion standard, because a trial court abuses its discretion when it misinterprets the law and proceeds in a manner not authorized by law. (*Upland Police Officers Assn. v. City of Upland, supra*, 111 Cal.App.4th at p. 1301.)

hearing be held within one year. The prisoner shall be notified in writing of the deputy commissioner's decision. The board shall adopt procedures that relate to the criteria for setting the hearing between two and five years."

Thus, with respect to any life prisoner who is eligible for parole, the Board may deny parole for up to two years if certain conditions are met. (§ 3041.5, subd. (b)(2)(A).) With respect to a parole-eligible life prisoner convicted of murder, the Board may deny parole for up to five years if certain conditions are met. (*Id.*, subd. (b)(2)(B).) In either case, the only statutory limitations on the Board's discretion are (1) that it must make a finding it is not reasonable to expect that parole would be granted in the years leading up to the next parole hearing, and (2) the Board must state the grounds for its decision. The statute contains no requirement that the Board must find a significant change in circumstances justifying a multiyear denial following a one-year denial.

Our Supreme Court has held that the Board must state its reasons for issuing a multiyear denial in a decision separate from the one denying parole. (*In re Jackson, supra,* 39 Cal.3d at p. 478.) The Board's decision to defer annual parole consideration hearings is guided by the same criteria used to determine parole suitability. (Cal. Code Regs., tit. 15, § 2270, subd. (d); see *id.,* § 2281; *In re Burns* (2006) 136 Cal.App.4th 1318, 1326 [40 Cal.Rptr.3d 1].) The reasons for postponing the next scheduled parole hearing need not be completely different from the reasons for denying parole suitability. (*In re Burns, supra,* 136 Cal.App.4th at p. 1326.) Rather, the only requirement is an identification of the reasons that justify postponement. (*Ibid.*; see also *In re Jackson, supra,* 39 Cal.3d at p. 479.)

"By its nature, the determination whether a prisoner should be released on parole is generally regarded as an executive branch decision. [Citations.] The decision, and the discretion implicit in it, are expressly committed to the executive branch. [Citations.]" (*In re Morrall* (2002) 102 Cal.App.4th 280, 287 [125 Cal.Rptr.2d 391]; see also Cal. Const., art. V, § 8; §§ 3040 et seq., 5075 et seq.)

The Board's discretion in parole-related matters has been described as "great" and "almost unlimited." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 [128 Cal.Rptr.2d 104, 59 P.3d 174].) Nevertheless, the requirement of procedural due process places some limitations upon the broad discretionary powers of the Board. (*Ibid.*) The judicial branch is authorized to review the factual basis of a decision of the Board, but in conducting such a review, "the court may inquire only whether *some evidence* in the record before the Board supports the decision to deny parole . . . ." (*Id.* at p. 658, italics added.) The "some evidence" standard of review governs consideration of a Board decision to postpone the next scheduled parole hearing by issuing a multiyear denial. (See *In re Burns, supra,* 136 Cal.App.4th at pp. 1327–1329.)

■ The separation of powers principle is embodied in the California Constitution, which provides as follows in article III, section 3: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." " 'The separation of powers doctrine limits the authority of one of the three branches of government to arrogate to itself the core functions of another branch. [Citations.]' [Citation.]" (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 662.) Although the doctrine is not intended to prohibit one branch from taking action that might affect those of another branch, the doctrine is violated when the actions of one branch "defeat or materially impair the inherent functions of another branch. [Citation.]" (*Ibid.*) Intrusions by the judiciary into the executive branch's realm of parole matters may violate the separation of powers. (See *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095, 1099 [97 Cal.Rptr.2d 382] [court order allowing inmate to question commissioners regarding their parole-related decision process violated separation of powers].)

■ Here, the court's order materially impairs the inherent discretion of the Board. Under section 3041.5, it is completely within the Board's discretion to issue a multiyear parole denial following a one-year denial even if no significant change in circumstances has occurred, so long as at least some evidence supports the decision. The court's order deprives the Board of that discretion.

■ There are a variety of situations in which the issuance of a multiyear denial following a one-year denial might be appropriate despite the lack of any significant change in circumstances. For example, at an earlier hearing at which the Board issued a one-year denial, there might have been evidence to support a multiyear denial but the Board exercised its discretion not to issue a multiyear denial. Nothing in the applicable statute *requires* the Board to issue a multiyear denial if justified by the evidence. (§ 3041.5, subd. (b)(2).) Stated differently, a one-year denial does not necessarily reflect an affirmative finding by the Board that it is reasonable to believe parole will be granted in one year.

Another situation in which it might be appropriate to issue a multiyear denial following a one-year denial is a case in which a panel of the Board concludes that the previous panel was mistaken in issuing only a one-year denial. Different decision makers may exercise their discretion in different ways, but that does not mean their decisions are necessarily arbitrary or

lacking in evidentiary support. A panel's discretion cannot be tethered to the discretionary decision of a prior panel.[9]

■ A fundamental infirmity in the court's order is that it does more than just require that the Board state some evidence supporting a postponement of an inmate's next scheduled parole hearing. In an individual case, when a petitioner who previously received a one-year denial challenges a multiyear denial and claims his due process rights were violated as a result of the postponement of his next scheduled parole date, the court's review is limited to determining whether some evidence supports the Board's findings.[10] If the court finds some evidence to support the postponement of parole but nonetheless requires the Board to state a "significant change in circumstances" justifying a multiyear denial following a one-year denial, the court's order would be improper, violate the standard of review, and intrude upon the Board's discretion. The result is no different here simply because the trial court certified a class of parole-eligible life prisoners. "If a specific form of relief is foreclosed to claimants as individuals, it remains unavailable to them even if they congregate into a class." (*Feitelberg v. Credit Suisse First Boston, LLC* (2005) 134 Cal.App.4th 997, 1018 [36 Cal.Rptr.3d 592].)

Petitioners argue that the trial court's decision is justified in part because the Board has failed to adopt procedures relating to the criteria for setting a subsequent hearing between two and five years, as it was purportedly required to do by legislation enacted in 1994.[11] (§ 3041.5, subd. (b)(2)(B), enacted by Stats. 1994, ch. 560, § 1, pp. 2833–2834.) However, the lack of detailed criteria distinguishing a two-year denial from a five-year denial does not support the court's material impairment of the Board's inherent discretion. If the concern were that the Board had failed to enact detailed regulations or procedures governing multiyear denials, the appropriate action would be to

---

[9] If an inmate consistently received one-year denials of parole and then received a multiyear denial, a court might be justified in closely scrutinizing the decision issuing a multiyear denial to ensure that it is supported by some evidence in the record. However, some evidence is all that is required. A panel of the Board need not point to additional evidence supporting its departure from the discretionary decisions of earlier panels.

[10] An individual Board member's subjective motivation for a parole decision is irrelevant provided there is some evidence to uphold the decision. (Cf. *Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006, 1022 [73 Cal.Rptr.2d 841, 953 P.2d 1188] [reviewing court may not explore subjective motivations for an agency decision but must instead conduct an objective inquiry of the evidence supporting the agency's findings].)

[11] In its reply brief, the Board contends it established criteria in 1995 for determining whether a multiyear denial of parole is appropriate. Petitioners have moved to strike this discussion from the Board's reply brief, arguing that this issue as well as several others were improperly raised for the first time on reply. Petitioners also seek to strike from the reply brief challenges to the evidence and the Board's argument that there is no constitutional right to timely parole hearings. Because our decision does not turn on these issues allegedly raised for the first time in the Board's reply brief, we deny the motion to strike as moot.

compel the Board to do so. (See *Alvarado v. Selma Convalescent Hospital* (2007) 153 Cal.App.4th 1292, 1306, fn. 5 [64 Cal.Rptr.3d 250].)

We conclude that the trial court's order as it relates to a multiyear denial following a one-year denial violates the separation of powers and intrudes upon the inherent discretion afforded to the Board to decide parole matters.

## II. *Hearing transcript backlog*

The Board challenges the trial court's May 10, 2007, order relating to the transcript backlog, contending the order is contrary to case law establishing that section 3042 does not require the Board to provide parole hearing transcripts to prisoners within 30 days of the hearing date. The Board further contends the order is improper because it addresses an issue not properly before the court in this habeas corpus proceeding.

Initially, we reject petitioners' contention the Board waived its objections to this order by failing to appeal from the November 2006 hearing at which the court declared the timely provision of transcripts to be within the purview of the case. An order that is merely preliminary to a later judgment or final order is not appealable. (See *In re Marriage of Levine* (1994) 28 Cal.App.4th 585, 589 [33 Cal.Rptr.2d 559] [court's order finding it had authority to take certain actions not appealable].) The Board properly preserved its objection at the November 2006 hearing and appealed from a subsequent order that affected the substantive rights of the parties.

In *Bode, supra,* 74 Cal.App.4th 1002, our colleagues in Division Five of this court held that section 3042, subdivision (b) requires that members of the public, not prisoners, must be provided a transcript of a parole hearing within 30 days of the hearing.[12] (*Bode, supra,* 74 Cal.App.4th at p. 1003.) There is no 30-day deadline for providing a life prisoner with a parole hearing transcript. (*Ibid.*) The Board argues that the trial court's May 2007 order misinterprets section 3042, subdivision (b) and is contrary to the holding in *Bode.*

At a minimum, the challenged order is ambiguous. The order could be read simply to direct compliance with the statutory mandate of section 3042, subdivision (b), which requires the Board to make parole hearing transcripts

---

[12] Although the *Bode* court recognized that prisoners have a due process right to receive a hearing transcript in a reasonably timely fashion (*Bode, supra,* 74 Cal.App.4th at p. 1007, fn. 2), that constitutional right is distinct from the 30-day statutory deadline for providing transcripts to members of the public. In *Bode,* the court concluded that the petitioner's constitutional due process rights were satisfied by receipt of the parole hearing transcript within 68 days of the hearing. (*Id.* at pp. 1004, 1007, fn. 2.)

"available to the public no later than 30 days from the date of the hearing." Under this reading of the order, the trial court complied with *Bode* at the same time it expressed disagreement with the holding of the case. On the other hand, the court's order could be read to compel a result directly at odds with *Bode* by directing delivery of transcripts to affected inmates within the 30-day period. Regardless of whether the trial court questions the wisdom of *Bode*, it is bound to follow the decision of the appellate court under the principle of stare decisis. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

We need not decide whether the trial court's order violates *Bode*, however, because there is an even more compelling reason to reverse the order addressing the transcript hearing backlog. Simply put, the court's order addressed an issue not properly before it in this habeas corpus proceeding, which is limited to the timely provision of parole hearings.

In a habeas corpus proceeding, the parties' pleadings define the issues. (*Board of Prison Terms v. Superior Court* (2005) 130 Cal.App.4th 1212, 1235 [31 Cal.Rptr.3d 70] (*Board of Prison Terms*).) The "petition serves primarily to launch the judicial inquiry into the legality of the restraints on the petitioner's personal liberty . . . ." (*People v. Romero* (1994) 8 Cal.4th 728, 738 [35 Cal.Rptr.2d 270, 883 P.2d 388].) "The return, which must allege facts establishing the legality of the petitioner's custody, 'becomes the principal pleading' [citation] and is 'analogous to the complaint in a civil proceeding' [citations]." (*Id.* at pp. 738–739, fn. omitted.) Upon the filing of the written return, the petitioner may file a response, commonly known as the traverse, in which the petitioner " 'may deny or controvert any of the material facts or matters set forth in the return, or except to the sufficiency thereof, or allege any fact to show either that his imprisonment or detention is unlawful, or that he is entitled to his discharge.' [Citation.]" (*Id.* at p. 739.) "[I]t is through the return and the traverse that the issues are joined in a habeas corpus proceeding. [Citations.]" (*Ibid.*) "[I]ssuance of a writ of habeas corpus or an order to show cause is an intermediate but nonetheless vital step in the process of determining whether the court should grant the affirmative relief that the petitioner has requested. The function of the writ or order is to 'institute a proceeding in which issues of fact are to be framed and decided.' [Citation.] The issuance of either the writ of habeas corpus or the order to show cause creates a 'cause[]' . . . [citations]. Thus, the writ or order is the means by which issues are joined (through the return and traverse) and the need for an evidentiary hearing determined." (*Id.* at p. 740.)

"Under this process, the issues to be addressed may not extend beyond the claims alleged in the habeas corpus petition. Thus, respondent may not raise additional issues in its return. [Citation.] [¶] Similarly, a habeas

corpus petitioner may not raise additional issues in the traverse." (*Board of Prison Terms, supra*, 130 Cal.App.4th at p. 1235.) "To bring additional claims before the court, petitioner must obtain leave to file a supplemental petition for writ of habeas corpus. [Citation.]" (*Ibid.*) "If the superior court grants leave to amend or supplement the petition and the petitioner files a supplemental petition that adds new claims not raised in the original habeas corpus petition, the trial court then may determine which of the claims states a prima facie case for habeas corpus relief and issue an appropriate order to show cause. The respondent must respond to the order to show cause by filing a return that addresses the prima facie claims, to which the petitioner may reply in a traverse. The issues are then properly joined in accordance with the well-established rules governing habeas corpus procedure." (*Id.* at p. 1240.)

Therefore, a court may not issue an order to show cause that adds new claims not raised in or supported by allegations in an original or supplemental habeas corpus petition. (See *Board of Prison Terms, supra*, 130 Cal.App.4th at p. 1239.) Even when claims are properly raised by way of a habeas corpus petition or a supplemental petition filed with the court's permission, the court typically may not grant relief unless it first issues an order to show cause or a writ of habeas corpus.[13] (*In re Olson* (2007) 149 Cal.App.4th 790, 802 [57 Cal.Rptr.3d 284].) In the absence of an order to show cause or a writ of habeas corpus, "there are no facts, issues or cause" before the court, and any order granting relief is a nullity unless the petitioner's custodian has stipulated to the truth of the factual allegations and to the requested relief. (*Ibid.*) Furthermore, when an order to show cause issues, the claims are limited to those alleged in the petition that form the basis of the court's order to show cause. (*In re Lawley* (2008) 42 Cal.4th 1231, 1248 [74 Cal.Rptr.3d 92, 179 P.3d 891].) The proceeding " 'is limited to the claims [that] the court initially determined stated a prima facie case for relief.' [Citation.]" (*Ibid.*, fn. omitted.)

As framed by the original habeas corpus petition, the sole claim at issue in this case is that the Board has failed to provide timely parole consideration hearings to inmates as required under the Penal Code. None of the initial pleadings discuss section 3042 or even allude to a concern about the timely provision of hearing transcripts. Not surprisingly, the issue is not raised in the order to show cause, the order granting the habeas corpus petition, the stipulated procedures, or the remedial plan. Furthermore, no motion has been made to supplement or amend the original habeas corpus petition to include claims related to parole hearing transcripts. The issue first came up in a status

---

[13] A court may grant relief without issuing an order to show cause or a writ of habeas corpus only when the petitioner's custodian "stipulate[s] to the truth of the petition's allegations and to the requested relief." (*People v. Romero, supra*, 8 Cal.4th at p. 740, fn. 7.)

hearing nine months after the court issued its order granting the habeas corpus petition. Therefore, the issue of the transcript backlog was never properly before the court. Even if the issue had been raised in a supplemental habeas corpus petition, the trial court never issued an order to show cause or writ of habeas corpus addressed to the issue of the transcript backlog. Without such an order or writ directed to the issue of the transcript backlog, the court could not properly grant relief addressed to the issue.

We disagree with the trial court's conclusion that hearing transcripts are within the purview of the case. A hearing transcript is not required in order to know whether a timely parole consideration hearing has taken place. Petitioners initially raised the issue not because it had any relation to whether parole hearings were being timely conducted, but instead because the alleged delay in receiving a transcript affected a prisoner's right to challenge the parole decision. Whether hearing transcripts are timely prepared is an entirely different issue from whether hearings are being conducted in a timely fashion, and presents a different set of issues and complexities. As petitioners themselves stated in a pleading filed in the trial court on May 22, 2007, this case "address[es] whether Penal Code section 3041, subdivision (a), and 3041.5, subdivision (b)(2), imposed mandatory timelines on the board for holding parole consideration hearings." Petitioners acknowledged the "remedial plan [in this case] *only* concerns prospective relief with the aim of ensuring timely hearings in the future." (Italics added.)

Petitioners contend this "unique" habeas corpus proceeding permits the parties to raise new issues after the initial round of pleadings. As support for this contention, petitioners cite the parties' stipulation giving the court ongoing jurisdiction to enforce its orders. They also attempt to distinguish cases addressing "traditional" habeas corpus procedure from this case, described as "perhaps the only class action habeas proceeding in recent California history," which according to petitioners "involves issues that continue to develop as the remedial process unfolds."

Contrary to petitioners' contention, the parties' stipulated procedures do not afford the court authority to issue orders on any matter the parties may raise, no matter how tenuous its connection to the timely provision of parole hearings. The Board stipulated that petitioners could seek further orders from the trial court if the Board was not making steady, significant progress in reducing the hearing backlog, or not complying with the stipulated procedures or remedial plan. The stipulation did not permit the court to address issues unrelated to the hearing backlog.

We are unaware of any support for petitioners' contention that the class action nature of this habeas corpus proceeding somehow permits the trial

court to address unrelated developing issues as the remedial process unfolds. To the contrary, there is no reason to believe that "traditional" habeas corpus procedures are inapplicable to a habeas corpus class action.[14]

The court's May 2007 order is especially problematic because it was entered in the context of a class action. There is no indication the named habeas corpus class representative—currently Inez Tito Lugo—has suffered any deprivation of his right to timely receive a hearing transcript. There is not necessarily any correlation between prisoners who are members of the class and prisoners for whom transcripts have not been timely prepared. The transcript backlog presumably affects prisoners without regard to whether their hearings have been timely held. The court's order addressing the transcript backlog is not limited to class members—those life prisoners whose hearings have been delayed—but purports to address the backlog with respect to all inmates in state prison who receive a parole consideration hearing, irrespective of their membership in the class. The order assessing a sanction of $10 for every day of delay in the preparation of every parole hearing transcript did not create a subclass of petitioners to whom the sanction applies and thus would presumably apply to an untold number of prisoners throughout California's vast correctional system. Not only does the order raise new issues concerning its implementation that were not carefully scrutinized, but the Board was never given notice that there was a potential for any such consequence in this litigation. We agree with the Board that the issue was not raised in these proceedings in a manner that permitted the court to entertain an application for such broad relief. Hence, the order of May 10, 2007, must be vacated to the extent it relates to the preparation of parole hearing transcripts.

## III. *Attorney fees multiplier*

The Board contends the trial court erred by applying a 1.5 multiplier in awarding attorney fees to class counsel for petitioners. We review an order awarding attorney fees for abuse of discretion. (*Serrano v. Priest, supra,* 20 Cal.3d at p. 49; *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096 [95 Cal.Rptr.2d 198, 997 P.2d 511].) "The trial court is the best judge of the value of professional services rendered in its court, and while its judgment is subject to our review, we will not disturb that determination unless we are convinced that it is clearly wrong. [Citations.] The only proper basis of reversal of the amount of an attorney fees award is if the amount awarded is so large or small that it shocks the conscience and suggests that passion and

---

[14] Because the Board has not challenged the trial court's order certifying a prisoner class, we have no occasion to consider the propriety of class certification in this habeas corpus matter. (See *In re Walters* (1975) 15 Cal.3d 738, 744, fn. 3 [126 Cal.Rptr. 239, 543 P.2d 607] [class certification unnecessary in habeas corpus proceeding because habeas corpus procedure already provides vehicle for general declaration of procedural rights of similarly situated individuals].)

prejudice influenced the determination. [Citation.]" (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1134 [94 Cal.Rptr.2d 448].) Applying this deferential standard of review, we conclude the trial court did not abuse its discretion.

■ "[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate. 'California courts have consistently held that a computation of time spent on a case and the reasonable value of that time is fundamental to a determination of an appropriate attorneys' fee award.' [Citation.] The reasonable hourly rate is that prevailing in the community for similar work. [Citations.] The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided. [Citation.]" (*PLCM Group, Inc. v. Drexler, supra*, 22 Cal.4th at p. 1095.)

As explained in *Serrano v. Priest*, once the lodestar has been calculated, it may be adjusted upward or downward based on factors including "(1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award; (4) the fact that an award against the state would ultimately fall upon the taxpayers; (5) the fact that the attorneys in question received public and charitable funding for the purpose of bringing law suits of the character here involved; (6) the fact that the monies awarded would inure not to the individual benefit of the attorneys involved but the organizations by which they are employed; and (7) the fact that in the court's view the two law firms involved had approximately an equal share in the success of the litigation." (*Serrano v. Priest, supra*, 20 Cal.3d at p. 49, fn. omitted.) This set of factors is illustrative only and does not constitute an exhaustive list of all relevant considerations that may justify an exercise of judicial discretion to increase or decrease the lodestar amount. (*Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819, 834 [112 Cal.Rptr.2d 284].)

The purpose of adjusting the lodestar is to "fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 [104 Cal.Rptr.2d 377, 17 P.3d 735].)

The Board does not dispute the calculation of the lodestar amount but instead claims the trial court abused its discretion by using a multiplier of 1.5,

effectively increasing the lodestar amount by 50 percent. In support of its order applying a 1.5 multiplier to the lodestar amount, the court cited the following: "the results obtained by counsel; that members of the Petitioner class have had steps taken already to insure that their overdue hearings are promptly held; the defendants have been required, because of this litigation, to meet their public duties of enforcing and complying with the requirements of the Penal Code; it's highly unlikely that this case would have been certified as a class action had it not been for Petitioner's counsel's involvement in and commitment to the matter; that the monies awarded will not inure to the individual benefit of Petitioner's counsel but will be used for nonprofit purposes." In its written order, the court stated the attorney fee award is justified in part because petitioners "vindicated an important statutory right affecting the public interest."

We agree with the Board that many of the factors cited in *Serrano v. Priest* weigh against enhancing the lodestar amount in this case. The litigation did not involve a contingent risk. The Prison Law Office was, in fact, paid by Marin County for its work on the case, albeit at a modest hourly rate. In addition, the enhanced fee award will ultimately fall upon the shoulders of California taxpayers.

Nevertheless, the trial court did identify a number of factors that properly support an upward adjustment to the lodestar. The court found that the fees will be awarded for the benefit of a nonprofit organization and not the individual attorneys employed by that organization. In addition, the court recognized, in effect, that the statewide results achieved by pursuing the matter as a class action resulted from class counsel's legal skills and persistence. (See *Ketchum v. Moses, supra,* 24 Cal.4th at p. 1139 [court can award multiplier for an exceptional quality of representation]; see also *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 582 [21 Cal.Rptr.3d 331, 101 P.3d 140] [enhancement to multiplier justified when exceptional effort produces exceptional benefit].)

Mindful that the trial judge is the best arbiter of the value of professional service rendered in the trial court, we cannot say the court was clearly wrong when it increased the lodestar amount by 50 percent. Furthermore, a multiplier of 1.5 is not large by comparison to those typically seen in reported cases. (See *Northwest Energetic Services, LLC v. California Franchise Tax Bd.* (2008) 159 Cal.App.4th 841, 882 [71 Cal.Rptr.3d 642] [reversing multiplier of 16]; *Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 255 [110 Cal.Rptr.2d 145] [multipliers can range from two to four or even higher]; *City of Oakland v. Oakland Raiders* (1988) 203 Cal.App.3d 78, 85–86 [249 Cal.Rptr. 606] [affirming multiplier of 2.34].)

DISPOSITION

The trial court's order of May 5, 2006, is affirmed with respect to the attorney fee award but is reversed to the extent it requires the Board "not to deny further parole consideration for more than one year in the case of prisoners who have formerly been denied for one year, in the absence of a significant change in circumstances, which must be stated on the record." The trial court's order of May 10, 2007, is reversed to the extent it relates to the preparation of parole hearing transcripts or imposes penalties for the untimely preparation of such transcripts.

Jenkins, J., concurred.

**POLLAK, J.,** Concurring.—This appeal arises out of proceedings in which the trial court has acted to correct long-standing deficiencies in the administration of California's parole system and the recurring violation of the statutory and constitutional rights of innumerable inmates. To put the limited issues that are presented by this appeal in their proper perspective, this concurrence will set out more fully the history of those proceedings. With respect to the three issues that are raised from the many rulings the trial court has made in these extended and ongoing proceedings, I join in the majority opinion in affirming the attorney fee award. I concur in the disposition of the order concerning the multiyear parole denials, but write separately to emphasize that what is lacking here is a record that supports the remedial order entered by the trial court. Because the record does not justify any remedial order, we have no occasion to consider whether under circumstances not established in the present record the particular remedy would be justified. I also concur in the disposition of the trial court order concerning the timely preparation of parole hearing transcripts, but add a few words to emphasize that in reversing the trial court order on procedural grounds we do not address whether prison inmates have the right to insist on compliance with Penal Code[1] section 3042, subdivision (b), nor do we condone the failure to comply with statutory time constraints.

*Procedural history*

The action generating the appeal was commenced in May 2004 when Jerry Rutherford, who was then serving an indeterminate prison term of seven years to life, filed a petition for a writ of habeas corpus alleging that what formerly was the Board of Prison Terms, now the Board of Parole Hearings (the Board), had failed to schedule a timely parole suitability hearing to which he was entitled under section 3041.5, subdivision (b)(2). The factual predicate explaining the course of these proceedings, however, begins far earlier.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

In April 2001, the superior court, in response to an earlier petition Rutherford had filed alleging that the Board had not timely scheduled his prior parole suitability hearing, found the Board to be in violation of the statute and ordered it to convene Rutherford's hearing within 120 days. (*In re Rutherford* (Super. Ct. Marin County, 2001, No. SC118989A).) Rutherford's case was not unusual. In March 2000, the state's Office of the Inspector General issued a report reviewing the operations of the Board and found, among other things, the following: despite the Board's "statutory responsibility for ensuring that the hearings are conducted in a proper and timely manner," the Board's "process for identifying and scheduling hearing cases is inadequate to ensure that hearings are properly managed and are handled on a timely basis." As a result, the Board's "backlog of hearings is so large that most of the hearings are delinquent. [¶] . . . According to information compiled from the institutions, the backlog increased from 204 on June 30, 1998, to 695 on June 30, 1999. The [B]oard staff projects the backlog to increase to 1,050 by June 30, 2000. Because of the backlog, most of the hearings are delinquent by more than six months." The Inspector General recommended that the Board "immediately begin acquiring the resources to establish a centralized system for tracking hearing cases" and "increase the number of hearings by one case per day unless other measures are available to reduce the backlog more quickly." A year later, in April 2002, the Office of the Inspector General issued a "Follow-Up Review of the Board of Prison Terms." The followup report found, among other things, that the Board's "system for identifying and scheduling indeterminate sentence hearings continues to be antiquated and, therefore, cannot provide adequate assurance that such hearings are properly managed and conducted with reasonable promptness" and that the Board had "not taken any proactive measures to reduce the backlog of indeterminate sentence hearings, which continued to grow until the implementation of [Senate Bill] 778 [Stats. 2001, ch. 131]."

During this time period, the present record reflects, numerous habeas corpus petitions alleging the denial of timely parole suitability hearings were filed and granted in superior courts throughout the state. In many, if not all, of these cases, the courts rejected the recurring argument that because section 3041.5 is directory rather than mandatory, the petitioning inmates were entitled to no relief. In March 2001, 33 inmates joined in a habeas corpus petition filed in the Marin County Superior Court (*In re Sanders* (Super. Ct. Marin County, 2001, No. SC118698A)) alleging that all were being denied timely suitability hearings and requesting broad corrective relief.[2] In responding, the Attorney General acknowledged that "[t]here is currently a state-wide backlog of parole consideration hearings. As of July 1, 2001, there were 1,908 backlogged cases." However, the Attorney General argued, among

---

[2] Sixty-one additional inmates subsequently unsuccessfully requested to be added as petitioners because their parole hearings were not being timely conducted.

other things, that the Legislature was in the process of enacting Senate Bill No. 778 (2001–2002 Reg. Sess.) as urgency legislation, largely as a result of which "the [hearing] backlog is expected to be eliminated in 21 months." After the bill became law, the superior court denied the Sanders' petition "as moot," observing that the new "law provides the Board of Prison Terms a budget augmentation of over $31,000,000 for the current fiscal year and the authority to make hearing panel changes which could more than double the hearing rate to eliminate the backlog of overdue hearings. No judicially ordered remedy could have been as effective as it appears [Senate Bill] 778 will be in dealing with the problem."[3]

When Rutherford filed his May 2004 petition, three years after the enactment of Senate Bill No. 778 (2001–2002 Reg. Sess.), the backlog had not been corrected. To the contrary, as of June 2004 there were 1,630 cases for which a parole hearing was overdue. According to the testimony ultimately presented at the evidentiary hearing in this case, as of August 2005 the backlog had grown to 3,200 cases and, although the new legislation had reduced the number of commissioners necessary to conduct a hearing, the Board had reduced the number of hearings commissioners conducted each week from 21 to 16. The Attorney General responded to Rutherford's petition by advising the court, as it had done regularly in other cases, that subsequent to the filing of the petition the Board had scheduled a hearing for Rutherford, and requesting that the action be dismissed as moot. The Attorney General also repeated the argument that it regularly made in other cases, that the statutory time limits were directory and "cannot be read to impose a mandatory duty upon the Board to provide a subsequent parole suitability hearing within a specific time." Rutherford opposed the dismissal and in addition filed a motion to certify a class, arguing that "[c]lass certification is necessary because petitioner's interest in a declaration of his rights is identical to the interests of all life prisoners entitled to parole consideration hearings, and because the current piecemeal approach to resolving disputes over hearing timeliness is insufficient and a waste of judicial resources."

On November 29, 2004, the court granted the motion, certifying a class defined as "all prisoners serving indeterminate terms of life with the possibility of parole, and who have approached or exceeded the minimum eligible

---

[3] It was in this order that the court stated that the "administrative problems and delays and the statutory scheme which makes the operations of the Board of Prison Terms clearly a function of the executive branch of government, have created a morass uniquely inappropriate for judicial resolution." The court went on to state, "Nevertheless, they have been of justifiable concern to the prisoners affected and to the people of good faith within the Board of Prison Terms who have, probably along with the Attorney General, been communicating everyone's distress over the unacceptable status quo to those in Sacramento who could effect a genuine remedy." As noted, the court went on to conclude that a "genuine remedy" had been legislatively provided.

parole dates without receiving the parole hearings within the time required by Penal Code §3041 and §3041.5." Citing authority from both federal courts (e.g., *Cox v. McCarthy* (9th Cir. 1987) 829 F.2d 800, 804–805 ["a class action may lie in habeas corpus"]) and from state courts (e.g., *Wilson v. Superior Court* (1987) 194 Cal.App.3d 1259, 1262 [240 Cal.Rptr. 131]; *Mendoza v. County of Tulare* (1982) 128 Cal.App.3d 403, 420 [180 Cal.Rptr. 347] ["a trial court may grant habeas corpus petitioners 'prospective or class relief' to redress recurring deprivations of rights at correctional facilities. [Citation.] The writ is thus an effective and versatile means by which to remedy persistent violations of prisoners' rights, and has been so used"]; *Rhyne v. Municipal Court* (1980) 113 Cal.App.3d 807, 811, 815 [170 Cal.Rptr. 312]), the trial court held that "[a] class action *habeas corpus* petition is a proper method to obtain a declaration and enforcement of a petitioner's rights as to the conditions of his confinement, as well as the rights of others similarly situated." Although the Attorney General had opposed the motion for class certification on several grounds, he did not seek appellate review of the trial court's order and, at the oral argument in the present appeal, acknowledged that he did not question the propriety of that order.[4]

Following class certification, the parties negotiated and in April 2005 entered a "Stipulation Regarding Overdue Parole Consideration Hearings" which the court entered as an order. The stipulation and order recited that "Penal Code sections 3041 and 3041.5 require the Board of Prison Terms to provide life prisoners with parole consideration hearings at least one year prior to their minimum eligible parole dates and, if parole is denied, at specified yearly intervals thereafter. Respondents are not currently meeting these time frames." The stipulation and order provided, among other things, that by June 6, 2005, the Board would develop "a streamlined psychological risk assessment tool to be used in conjunction with subsequent parole consideration hearings" and "a plan to provide completed Life Prisoner Evaluation Reports, attorney appointments, and attorney-client interviews far enough in advance of scheduled consideration hearings to allow another inmate to be scheduled if the hearing for the first inmate is postponed or canceled for any reason" that, by September 5, 2005, the Board would

---

[4] Since the propriety of the class certification order is not before us on this appeal, there is no occasion to consider whether class certification was necessary because a habeas corpus procedure itself provides a vehicle for a general declaration of the procedural rights of similarly situated individuals. (See *In re Walters* (1975) 15 Cal.3d 738, 744, fn. 3 [126 Cal.Rptr. 239, 543 P.2d 607].) However, potential issues arising from the class certification may require future correction or clarification. The class as defined does not specify a time period during which class members must have been denied a timely hearing, so that membership in the class presumably is constantly changing and questions may arise as to precisely which inmates are bound by the outcome of these proceedings. The court did not give class members the opportunity to opt out of the class, which may create issues if inmates denied timely parole hearings seek to file their own habeas corpus petitions.

"submit a detailed plan to eliminate the backlog of overdue parole consideration hearings and to conduct future hearings within the statutory time periods" and would "eliminate the backlog of overdue parole consideration hearings within 18 months of the court endorsing the September 5, 2005 plan to eliminate the backlog."

The court granted joint requests for additional continuances of the evidentiary hearing on the application for habeas corpus relief, to permit continuing negotiations between the parties. The petition ultimately came on for hearing in January 2006. The court heard testimony from Michael Keith Brady, the *Rutherford* task force project manager for the California Department of Corrections and Rehabilitation, and from Dennis Kenneally, responsible for management oversight at the Board, received exhibits in evidence, heard oral argument and, after taking the matter under submission, on February 15, 2006, entered an "Order Granting Application for Writ of Habeas Corpus." The order recites, in part, "Having carefully reviewed the evidence in this case, the court finds inescapable the conclusion that respondents are failing to furnish timely parole eligibility hearings to prisoners serving indeterminate sentences, and that the backlog of such overdue hearings is increasing at an alarming rate." The court found it "noteworthy that in July, 2001 [in *In re Sanders, supra,* No. SC118698A] respondents estimated that the backlog would be eliminated in 21 months. Instead, 55 months later, the backlog has not been eliminated, but rather it has *increased* by 55%." The court further observed that "Mr. Kenneally acknowledged the problem of overdue hearings but testified that commissioner vacancies are the primary reason for it. He estimated that if the Governor's draft budget is adopted *without change on the subject of funding for the Board of Parole Hearings,* the backlog will be eliminated in 14 months. This prediction echoes the inaccurate prediction of respondents back in July 2001." (Fn. omitted.) The recitation concludes, "Petitioner has demonstrated to this court's satisfaction that the remedy of individual judges granting individual applications for writs of habeas corpus cannot adequately address this problem. Indeed, at a hearing in this court on August 31, 2004, respondents admitted their policy that they will comply with the mandate of [Penal Code] §3041.5 only if and when an inmate seeks and obtains relief in habeas corpus; otherwise, respondents conceded that they will continue to do what they have done in the past, which has resulted in a backlog of overdue hearings totaling 3200. [¶] Petitioner has also convinced this court that allowing respondents to address this problem by doing what they have done in the past will not only fail to solve the problem, it will exacerbate it. Indeed, in 2018, when the 'three strikes' inmates become eligible for parole, both sides of this issue agree that the pressure on the parole board will increase logarithmically."

The February 15, 2006 order directs the Board "to take immediate measures to comply with the statutory time limits for holding parole hearings,

barring exceptional circumstances," appoints the Prison Law Office as class counsel and orders petitioner to file a motion to determine the amount of their attorney fees, directs notice to the class, states its intention "to adopt a plan effectuating this order in a fashion which is as minimally intrusive as possible, in order to accord substantial deference to the [California Department of Correction's] legitimate interest in managing a correctional facility," and directs counsel "to confer and agree upon a plan to implement the court's order, and report that agreement to the court within 30 days of this order. If by that date, the parties cannot agree on a plan, they are directed to submit any part of the plan agreed to, or a statement that the parties were unable to agree on any aspect of a remedial plan."

Pursuant to this order, the parties engaged in further negotiations and submitted to the court "Stipulated Procedures and Remedial Plan" for eliminating the hearing backlog, much of which called for continuing efforts and court oversight. In addition, the parties advised the court of six issues on which they had been unable to agree. The fifth of these issues, the only one giving rise to a decision that is challenged on appeal, was as follows: "Petitioners' position is that the court should order respondents not to deny further parole consideration for two, three, four or five years in cases involving prisoners who previously received only one-year denials of parole absent a significant change in circumstances. Respondents' position is that individual parole decisions must be left to the discretion of the hearing panel, and that the panel should not be bound by the decisions of prior panels." Following additional briefing, the court issued an order resolving the six reserved issues, and also ruling on the attorney fee motion. As to the issue of multiyear parole denials, the court ruled: "Respondents are ordered not to deny further parole consideration for more than one year in the case of prisoners who have formerly been denied for one year, in the absence of a significant change in circumstances, which must be stated on the record." As to attorney fees, the court applied a multiplier of 1.5 to the stipulated lodestar of $55,449.66, added costs and fees for the fee motion, and awarded a total of $90,203.72.[5] Additionally, this order substituted Inez Tito Lugo as class representative, since the original class representative, Jerry Rutherford, had died. Respondents filed a timely notice of appeal from this order (No. A114111), and this court issued a writ of supersedeas staying enforcement of the portions of the order concerning multiyear parole denials and the application of the 1.5 multiplier to the attorney fee award.

---

[5] Respondents agreed that petitioner was entitled to a base fee of $58,460, computed on an hourly basis. Of this amount, $3,010.34 was ordered reimbursed to the County of Marin for the fees it had already paid petitioner's counsel. The multiplier was then applied to the balance of $55,449.66. Petitioner was awarded $1,979.23 in costs and $5,050 as fees in connection with the fee motion, to which no multiplier was applied.

Throughout 2006, the parties continued to submit reports to the court concerning the progress that had been made toward remediating the parole hearing backlog. In a status report filed November 9, 2006, petitioner raised a complaint that the Board was not providing parole hearing transcripts to inmates in a timely manner. Petitioner argued that some prisoners were waiting months for their transcripts in spite of section 3042, subdivision (b), which they claimed requires the Board to provide a hearing transcript within 30 days of the hearing. Petitioner complained that the delay in receiving transcripts "presents a barrier to prisoners' access to the courts because they must attach a copy of the hearing transcript to any petition for writ of habeas corpus they may file to challenge any aspect of the hearing decision."

At a status conference on November 16, 2006, the Board's attorney told the court that efforts were being made to reduce the transcript backlog but also argued that the timely provision of hearing transcripts was beyond the scope of this litigation. The court initially reacted to the issue as follows: "Well, it's—it's kind of the same problem we have with the overdue parole hearings. We have laws on the books that say this is how it's supposed to be, and the respondents, for all kinds of reasons, aren't doing it." The court ruled that the issue of delayed hearing transcripts was within the purview of the court's jurisdiction because a parole hearing is not complete unless the transcript is furnished to the inmate.

At subsequent status hearings, the Board provided estimates regarding when the transcript backlog would be eliminated. In a brief filed April 27, 2007, petitioner argued that the Board should be ordered to reduce the transcript backlog within 30 days. The Board responded that it was taking appropriate steps to eliminate the transcript backlog but noted that, in any event, there is no statutory requirement that transcripts be provided to inmates within 30 days of the hearing date, citing section 3042, subdivision (b) and the decision of another division of this court in *In re Bode* (1999) 74 Cal.App.4th 1002 [88 Cal.Rptr.2d 536]. The issue was argued at a hearing on May 10, 2007, at the conclusion of which the court ordered the transcript backlog eliminated by June 15, 2007, and further ordered that a sanction of $10 per day per delayed transcript would be imposed after that date. No formal signed order was entered but the minute order from the hearing reads, in pertinent part: "The court states transcripts are to issue 30 days after hearing. Prisoners are members of the public. Commencing 6/1/07 [*sic*: 6/15/07] $10 per day per late transcript is ordered."

*Multiyear denials of parole*

Parole consideration procedures are governed by section 3040 et seq. and apply to all inmates not serving a determinate sentence. (*In re Jackson* (1985)

39 Cal.3d 464, 468 [216 Cal.Rptr. 760, 703 P.2d 100].) If the Board concludes following a hearing that a life prisoner who is eligible for parole is not suitable for release on parole, the next hearing to consider parole suitability is normally scheduled for the following year. (*Ibid.*; § 3041.5, subd. (b)(2).) In such circumstances the denial ordinarily is referred to as a "one-year denial."

Section 3041.5, subdivision (b)(2) affords the Board discretion under certain circumstances to issue "multiyear denials," in which case the next scheduled parole hearing may be scheduled no later than the following: "(A) Two years after any hearing at which parole is denied if the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following year and states the bases for the finding. [¶] (B) Up to five years after any hearing at which parole is denied if the prisoner has been convicted of murder, and the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following years and states the bases for the finding in writing. If the board defers a hearing five years, the prisoner's central file shall be reviewed by a deputy commissioner within three years at which time the deputy commissioner may direct that a hearing be held within one year. The prisoner shall be notified in writing of the deputy commissioner's decision. The board shall adopt procedures that relate to the criteria for setting the hearing between two and five years." Petitioner argues that the Board has been using multiyear denials as an "unlawful and unethical" means of reducing the hearing backlog. In the trial court they supported this contention with 16 "lifer polls," unverified questionnaires completed by 16 inmates previously issued one-year denials (two of whom were actually granted parole by the Board but whose release was overturned by the Governor) who subsequently were denied parole with their next hearing scheduled two or more years later. Petitioner claims that the Board provided no explanation for the multiyear denials for these inmates who had previously received one-year denials, and that in the absence of an explanation, the inference to be drawn is that the subsequent hearings were deferred beyond one year simply to reduce the hearing backlog. The inference is strengthened, petitioner now argues, by the fact that the passage of time normally renders an inmate more rather than less suitable for parole. (*Hayward v. Marshall* (9th Cir. 2008) 512 F.3d 536, 546–547; *In re Roderick* (2007) 154 Cal.App.4th 242, 276–278 [65 Cal.Rptr.3d 16].) Moreover, petitioner points out that when the statute was amended to authorize deferring subsequent hearings up to five years, the statute also required the Board to "adopt procedures that relate to the criteria for setting the hearing between two and five years" (§ 3041.5, subd. (b)(2)(B), amended by Stats. 1994,

ch. 560, § 1, p. 2833), and no such criteria have yet been adopted.[6] "[I]n the absence of such criteria," petitioner argued to the trial court, "the Board seems to be using the availability of the multi-year parole denial to address the hearing backlog in the short term." The Board argued in response that petitioner's showing was entirely speculative and that *absent evidence that this tactic is being used to improperly reduce the backlog,* it would be improper for the Court to restrict the Board's discretionary parole determinations in any way." (Italics added.)

On appeal, the Attorney General takes a somewhat different tack, arguing that the means by which the trial court sought to remedy the Board's perceived circumvention of the statutory requirements necessarily violates the constitutional separation of powers. (Cal. Const., art. III, § 3; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 661–662 [128 Cal.Rptr.2d 104, 59 P.3d 174].) The Attorney General argues that, even if the Board were deferring subsequent parole consideration hearings for an impermissible reason, the court invades the discretion that section 3041.5 confers on the Board by imposing the requirement that there be "a significant change in circumstances" before denying parole consideration for more than one year to a prisoner who formerly had been denied for only a single year. However, we need not decide here whether such a remedy would be justified if the Board were pursuing such a policy, because the record fails to establish that this has been the Board's practice.

"[A] grant of parole is an integral part of the penological system intended to help those convicted of crime to integrate into society as constructive individuals as soon as possible and alleviate the cost of maintaining them in custodial facilities . . . ." (*People v. Vickers* (1972) 8 Cal.3d 451, 458 [105 Cal.Rptr. 305, 503 P.2d 1313]; see also *Morrissey v. Brewer* (1972) 408 U.S.

---

[6] In its reply brief in this court, the Board for the first time argues that it "fully complied" with the mandate imposed by the statute in 1995 when it amended California Code of Regulations, title 15, section 2270 to add subdivision (d). This subdivision provides, in relevant part, "In cases in which the panel may deny a subsequent parole hearing for more than one year, it shall utilize the criteria specified in sections 2281 or 2402 as applicable. It shall make specific written findings stating the bases for the decision to defer the subsequent suitability hearing for two, three, four, or five years." Sections 2281 and 2402 of title 15 of the California Code of Regulations list the circumstances that are to be considered in determining parole suitability. The reasons for refusing to set a parole date need not "necessarily be completely different from the reasons for excepting an inmate's case from annual review" (*In re Jackson, supra,* 39 Cal.3d at p. 479) and it has been held that "the Board's regulations are [not] invalid to the extent that they allow it to rely on the same reasons to deny parole and to defer the next hearing" (*In re Burns* (2006) 136 Cal.App.4th 1318, 1326, fn. 3 [40 Cal.Rptr.3d 1]). Nonetheless, other than referring to the regulations specifying the circumstances tending to show suitability and unsuitability for parole, section 2270, subdivision (d) contains no criteria for determining whether an inmate found to be unsuitable should be denied a hearing for more than one year, much less for determining whether the denial should be for two, three, four or five years.

471, 477 [33 L.Ed.2d 484, 92 S.Ct. 2593].) "Under section 3041, subdivision (a), release on parole is the rule, rather than the exception." (*In re Smith* (2003) 114 Cal.App.4th 343, 351 [7 Cal.Rptr.3d 655].) Notwithstanding the broad discretion conferred on the Board to determine when an inmate meets the legislative standards entitling him or her to parole, the standards "create liberty interests in parole release that are entitled to protection under the Due Process Clause." (*Board of Pardons v. Allen* (1987) 482 U.S. 369, 371 [96 L.Ed.2d 303, 107 S.Ct. 2415]; see *Greenholtz v. Nebraska Penal Inmates* (1979) 442 U.S. 1, 11 [60 L.Ed.2d 668, 99 S.Ct. 2100].) It has long been recognized in California that "a prisoner eligible for parole has the right to apply therefor and to have his application duly considered . . . ." (*In re Schoengarth* (1967) 66 Cal.2d 295, 300 [57 Cal.Rptr. 600, 425 P.2d 200].) "Although a prisoner may not have a right to be released on parole, parole cannot be withheld unless by means consonant with due process." (*In re Minnis* (1972) 7 Cal.3d 639, 649 [102 Cal.Rptr. 749, 498 P.2d 997].) As the California Supreme Court reiterated in *In re Rosenkrantz*, its past decisions "make clear that the requirement of procedural due process embodied in the California Constitution (Cal. Const., art. I, § 7, subd. (a)) places some limitations upon the broad discretionary authority of the Board. In [*In re Sturm* (1974)] 11 Cal.3d 258 [113 Cal.Rptr. 361, 521 P.2d 97] we found in prior California decisions 'a limited cognizance of rights of parole applicants to be free from an arbitrary parole decision, to secure information necessary to prepare for interviews with the [Board], and to something more than mere pro forma consideration.' " (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 655; see also *id.* at p. 683.)

"A fundamental requirement of due process is 'the opportunity to be heard.' [Citation.] It is an opportunity which must be granted at a meaningful time and in a meaningful manner." (*Armstrong v. Manzo* (1965) 380 U.S. 545, 552 [14 L.Ed.2d 62, 85 S.Ct. 1187]; see *People v. Litmon* (2008) 162 Cal.App.4th 383, 395 [76 Cal.Rptr.3d 122].) Were it demonstrated that the Board is pursuing a policy of deferring parole hearings for the impermissible purpose of reducing the backlog, the court would be obliged to take corrective action. "The basic remedy available to correct arbitrary Authority [referring to the Adult Authority, that formerly acted on parole applications] action is the writ of habeas corpus." (*In re Sturm, supra,* 11 Cal.3d at p. 269.) As our Supreme Court has stated, it "has traditionally accepted its responsibility to prevent an authority vested with discretion from implementing a policy which would defeat the legislative motive for enacting a system of laws." (*In re Minnis, supra,* 7 Cal.3d at p. 645.)

However, the proper form and scope of relief depend on the nature of the violation shown by the evidence. (*Swann v. Board of Education* (1971) 402 U.S. 1, 16 [28 L.Ed.2d 554, 91 S.Ct. 1267] ["As with any equity case, the nature of the violation determines the scope of the remedy."].) Without a clear

understanding of the precise respects in which agency policy departs from statutory and constitutional restrictions, it is not possible to determine the extent of the remedy that may be appropriate, much less whether such a remedy would unjustifiably intrude upon the legitimate exercise of the Board's prerogatives. Certainly the court may be justified in remedying a persistent violation of the constitutional rights of large numbers of persons by imposing limits on what otherwise would be within the discretion of an offending executive agency. (See *id.* at pp. 16, 15 ["School authorities are traditionally charged with broad power to formulate and implement educational policy . . . ." If, however, "school authorities fail in their affirmative obligations [to desegregate schools], judicial authority may be invoked. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies"]; *Hutto v. Finney* (1978) 437 U.S. 678, 687 [57 L.Ed.2d 522, 98 S.Ct. 2565] [while state Department of Corrections and Rehabilitation has primary responsibility for curing constitutional violations, where the department had been given repeated opportunities to remedy the cruel and unusual conditions in the isolation cells, the court had authority to enter "a comprehensive order to insure against the risk of inadequate compliance"]; *Oregon Advocacy Center v. Mink* (9th Cir. 2003) 322 F.3d 1101 [state mental hospital's significant, ongoing violations of substantive and procedural due process, by delays in admitting incapacitated criminal defendants for evaluation and treatment, were sufficient to support an injunction requiring the hospital to admit such defendants within seven days of a trial court's finding of incapacity to stand trial].)

Nevertheless, it is unnecessary to explore the limits of appropriate judicial relief because in this case the predicate for any such relief is lacking. While the present record may raise the question whether the Board has been deferring parole hearings simply to reduce the hearing backlog, the record is insufficient to answer it. At most, the record contains evidence that some multiyear denials have followed prior one-year denials. Even that showing is questionable as an evidentiary matter, since the 16 lifer polls submitted to the trial court were unverified. More importantly, however, those documents fail to show whether the Board gave separate reasons for the extended denials, much less whether there was or was not an evidentiary basis for those reasons. Section 3041.5 explicitly requires that the Board state in writing its reasons for a multiyear denial and there is nothing in the record that indicates that it has failed to do so. (See *In re Jackson, supra,* 39 Cal.3d at pp. 477–480.) The record before the trial court does not contain the record of any of the 16 parole hearings to which the lifer polls refer or of any other parole hearing in which it is contended that there was an impermissible multiyear denial. While petitioner argues that the Board has not provided any explanation for the multiyear denials reflected by the 16 lifer polls, it was not

its burden to do so. The court may not assume that the Board is failing to comply with the statute. (Evid. Code, § 664.) If petitioner claims that the Board has been acting unlawfully it is his burden to present the evidence establishing that fact. Moreover, the Board has presented evidence to the contrary. In response to the question, "Have you found that some commissioners on the board are giving out multiple-year denials in order to reduce the number of cases in the backlog?," Michael Brady, the *Rutherford* task force project manager, answered, "Absolutely not." Brady testified that there has been an increase in the total number of parole hearings each year and that this increase has been responsible for a proportional increase in the number of multiyear denials. In all events, in marked contrast to the substantial and unquestioned evidence establishing the Board's failure to provide timely hearings, there is no competent evidence showing that multiyear denials are being used as a subterfuge to reduce the backlog. While one would expect there to be good reason for imposing a multiyear denial for an inmate previously found entitled to a one-year denial, there is in this record no basis for concluding that the Board has not found and announced adequate reasons when denying a hearing for more than one year. There is, therefore, no basis for any remedial order designed to enforce the standard prescribed by the statute—that it is not reasonable to expect that parole would be granted at a hearing during the following year. Thus, I agree that on the basis of the record before us the order directing the Board not to deny further parole consideration for more than one year in the case of prisoners who have formerly been denied for one year "without a significant change in circumstances" must be vacated.

*Hearing transcript backlog*

The Board also challenges the order entered by the court on May 10, 2007, with respect to continuing delay in the preparation of transcripts of the parole hearings. Section 3042, subdivision (b) provides that transcripts of all hearings "shall be filed and maintained in the office of the Board of Prison Terms and shall be made available to the public no later than 30 days from the date of the hearing." Section 3041.5, subdivision (a)(4) provides that the prisoner "shall be permitted to request and receive a stenographic record of all proceedings." Following submission of petitioner's request for an order directing the Board to reduce the transcript backlog within 30 days, the court ruled as follows: "Okay. Here's the history of the transcripts issue—at least the recent history. In December, 2006, the Board's counsel, the Attorney General, said that the backlog of transcripts was going to be cured by the end of January, 2007. It's now May, the backlog has not been cured, since—allegedly because the Board had the misfortune to contract with a transcription company that dropped the transcript ball. [¶] That—whatever the problem is, the situation hasn't been remedied. It's not hard to remedy. Send—get those tapes and send them to somebody who can do the job. I

expect the backlog to be remedied by June 15th, and if it isn't, a sanction of $10 per day, per transcript, is going to be imposed, and I'm going to have a status hearing on this issue on June 20th."

Initially, I agree with the majority opinion that the Board did not waive its objections to this order by failing to appeal following the November 2006 hearing at which the court declared the timely provision of transcripts to be within the purview of the case. (See *In re Marriage of Levine* (1994) 28 Cal.App.4th 585, 589 [33 Cal.Rptr.2d 559].) I also agree that the timeliness of transcript preparation was not properly before the court in these proceedings. There may be a loose connection between the denial of timely parole hearings and the failure to timely prepare transcripts of the parole hearings, because both delay an inmate's ability to challenge judicially an eventual parole denial by the Board. Nonetheless, a hearing transcript is not required in order to know whether a timely parole consideration hearing has taken place and, as explained in the majority opinion, the necessary steps to address the transcript backlog in these proceedings were not followed.

I am not unsympathetic with the trial court's reaction to another apparent instance in which the Board—for whatever reason—was persistently failing to comply with a statutory timeline. However, while I can appreciate the trial court's efforts to prod compliance with statutory requirements affecting the rights of many people, I must agree that the issue was not properly raised in these proceedings and, for the reasons mentioned in the majority opinion, that the order entered is particularly troublesome because entered in the context of a class action.

Finally, I wish to emphasize that this court's conclusion does not imply agreement with the contention that a proper action by an inmate to enforce compliance with section 3042, subdivision (b) is precluded by *In re Bode, supra,* 74 Cal.App.4th 1002. I agree with the majority opinion that the trial court's order is ambiguous in that it is not clear whether the court intended to require only the preparation and filing of hearing transcripts within 30 days, as required by section 3042, subdivision (b), or the delivery of transcripts to the affected inmate within the 30-day period. The decision in *Bode* relates only to the latter. In *Bode,* an inmate did not receive the transcript of his parole hearing until 68 days after the hearing, although the transcript was prepared and filed within the 30-day period prescribed by section 3042, subdivision (b). The court rejected the inmate's contention that the failure to deliver the record to the inmate within the 30-day period violated his rights under section 3042, subdivision (b). The court held that this section is

intended to ensure that the public has access to the transcript before an inmate is released on parole, that section 3041.5 imposes no deadline for the delivery of the transcript to the inmate, and that due process requires only that the transcript be delivered to the prisoner "in reasonably timely fashion." (74 Cal.App.4th at p. 1007, fn. 2.) Although the *Bode* opinion includes the statement that section 3042, subdivision (b) "create[s] a right in favor of the public, not the prisoner" (*id.* at p. 1006), the court did not hold that an inmate is not a member of the public entitled to enforce the provisions of section 3042, subdivision (b). It held only that there is no requirement that a copy of the transcript be delivered to the inmate within the 30-day period. (74 Cal.App.4th at p. 1006.)